UNITED STATES DEPARTMENT OF LABOR

BENEFITS REVIEW BOARD

In the Matter of

Kimberly Duvall
Survivor of Edward Duvall,

v.                                                    BRB No.      EFS-BFB-2311-250914

The McHenry Management Group, Inc.                    OALJ No.     2018-LDA-00591
*Petitioner - Employer*
                                                      OWCP No.   06-320344

Mi-Tech, Inc.
*Respondent - Employer*

and

Kimberly Duvall
Survivor of Edward Duvall
*Respondent - Claimant*

and

Starr Indemnity & Liability Company, and
Chubb Insurance Company
*Respondent - Carriers*

and

Director, Office of Workers' Compensation
Programs
*Respondent - Party-in-Interest*

## <u>PETITIONER-EMPLOYER THE MCHENRY MANAGEMENT GROUP, INC.'S OPENING BRIEF</u>

Petitioner-Employer The McHenry Management Group, Inc. (hereinafter, "TMMG") hereby submits this brief in support of its Petition for Review of the Decision and Order issued by the Honorable Pamela Kultgen, Administrative Law Judge, dated October 13, 2023, and filed and served on October 16, 2023.

1

I-2691334.2

**EXHIBIT B**

## STATEMENT OF FACTS

On or about May 27, 2017, Ace American Insurance Company ("Chubb") issued TMMG a Defense Base Act Workers Compensation and Employers Liability Insurance Company Policy, Policy No. D38060387 (hereinafter, the "Policy").  Dowling Aff. ¶ 7, Ex. A.[1]  Coverage under the Policy ran from March 27, 2017 through March 27, 2018.  *Id.*

The Policy included the following language: "This policy covers **all of your contracts or projects in the specified countries listed in the Defense Base Act Coverage Endorsement** unless you have other insurance or are self-insured for such workplaces." *Id.* at p. 5 (emphasis added).  Additionally, the Policy's Information Page provided: "Part One of the policy applies only to those **contracts or projects in the countries shown in the Schedule set out in the Defense Base Act Coverage Endorsement**. . . ." *Id.* at p. 4 (emphasis added).  The Defense Base Act Coverage Endorsement stated that "Any coverage provided by the policy for Defense Base Act coverage shall only apply to those **contracts and/or projects listed or identified in the Schedule below**." *Id.* at p. 14 (emphasis added).  The Defense Base Act Coverage Endorsement included the following four countries: the Philippines, Diego Garcia, the United Arab Emirates, and **Croatia**. *Id.* (emphasis added).  The Endorsement identified one Contract Number: N00033-14-D-8005 (Dept of Navy).  *Id.*  Finally, the Endorsement included the following language: "Description of Operations: SMART Inspections".  *Id.*

TMMG agreed to act effectively as a pass-through intermediary between Mi-Tech and the Viktor Lenac Shipyard in Croatia.  *Id.* at ¶ 13.  Pursuant to that agreement, TMMG entered into Contract No. 2017/106 (hereinafter, the "Contract") with the Viktor Lenac Shipyard "to provide

---

[1] Shane Dowling is the Chief Executive Officer of TMMG. His Affidavit is attached to this Brief as its **Exhibit 1** and its contents are incorporated.

[a] Mi-Tech Engineer to attend USS Mount Whitney and provide supervision and assistance during works on the ship's SSTG IC Turbine Rotor and Reduction Gear Assembly." *Id.* at ¶ 13, Ex. B. TMMG then entered into a contract with Mi-Tech *via* TMMG's Purchase Order No. TMMGMSC2017694 (hereinafter, the "Purchase Order"), in order to provide a Mi-Tech engineer to attend USS MOUNT WHITNEY and to perform its obligations under Contract No. 2017/106. *Id.* at ¶ 14, Ex. C. Mr. Duvall was the Mi-Tech engineer selected for the job. *Id.* at ¶ 15. Mr. Duvall arrived in Croatia in early September pursuant to the Purchase Order. *Id.* at ¶ 19. Unfortunately, on September 27, 2017, Mr. Duvall suffered a fatal heart attack in an office at the Viktor Lenac Shipyard. *Id.* at ¶ 22.

## THE ALJ'S DECISION

The Administrative Law Judge determined that Mr. Duvall's death was caused by a work-related heart attack and awarded the claimant, Ms. Duvall, funeral expenses and death compensation benefits. *Kimberly Duvall v. Mi-Tech, Inc., et al.*, Case No. 2018-LDA-00591, slip op. at 4 (Oct. 13, 2023). In reaching her Decision, Judge Kultgen found that a contractor-subcontractor relationship existed between TMMG and Mi-Tech and that neither Mi-Tech nor TMMG secured Defense Base Act insurance coverage for Ms. Duvall's claim for death benefits. *Id.* As part of her Decision Judge Kultgen specifically found that the Chubb DBA Policy issued to TMMG did not afford TMMG coverage for Ms. Duvall's claim. *Id.*

## ISSUE FOR REVIEW

I.    Whether the ALJ's finding that TMMG's policy for Defense Base Act Workers Compensation does not provide coverage for Claimant Duvall's claim against TMMG was in error.

**STANDARD OF REVIEW**

The Board's review of a Decision and Order issued by an Administrative Law Judge is limited.  *See Director, Office of Workers' Compensation Programs v. Rowe*, 710 F.2d 251 (6th Cir. 1983).  The Board "is not empowered to engage in *de novo* review but rather is limited to reviewing the ALJ's decision for errors of law and to determine whether the factual findings are supported by substantial evidence in the record viewed as a whole."  *Id.* (citing 33 U.S.C. § 921(b)(3); 20 CFR § 802.301).  A finding of fact or conclusion of law made by an administrative law judge may only be set aside by the Board if it is not supported by substantial evidence or if it is not consistent with the law.  *Id.*

**ARGUMENT**

I.    **The position ostensibly taken by TMMG in the proceedings below regarding Chubb's coverage was *not* TMMG's position, is contrary to TMMG's position on that issue, and is the product of an irreconcilable conflict of interest on the part of its counsel.**

Only recently has TMMG come to learn that the lawyer it believed was representing its interests exclusively in these proceedings—for years—was in fact also representing Chubb all along and, worse, actively pursuing a strategy advancing Chubb's interests at the expense of TMMG's own.  To be clear, at all times relevant to these proceedings, it manifestly has been and still is in *TMMG*'s best interest for it to have coverage under Chubb's DBA Policy for Ms. Duvall's claim.  However, it is equally clear that throughout the duration of these proceedings, it has been and still is in *Chubb*'s best interest for no such coverage to exist.  These two interests are diametrically opposed, place TMMG and Chubb in adverse positions vis-à-vis one another, and create a classic and obvious concurrent conflict of interest.  Unfortunately, the case for only one

4

of these interests—Chubb's—was presented to Administrative Law Judge Kultgen in this case.[2]

Accordingly, and for the reasons set forth below, TMMG respectfully requests that the Board ignore the coverage position taken in TMMG's name in these proceedings prior to this point, and allow TMMG now, for the first time in this appeal, to advocate for what TMMG's *own* position has been all along in regard to the question of Chubb's coverage for this claim.

On or about March 27, 2017, Chubb issued the Policy to TMMG. Dowling Aff. ¶ 7, Ex. A. Under the terms of that Policy, Chubb agreed to defend, at its own expense, any claim, proceeding, or suit against TMMG for benefits payable under that Policy. *Id.* at Ex. A, p. 6. On January 2, 2019, counsel for Ms. Duvall asserted such a claim against TMMG when it moved to add TMMG as a party to this case. *See* Employee's Mot. to Add Party filed on January 2, 2019. (A true and correct copy is attached as **Exhibit 3**.) On March 20, 2019, Chubb informed TMMG that it had assigned Robert Popich (admitted to practice in Louisiana), of Mouledoux, Bland, Legrand & Brackett, to provide a defense to *TMMG* for the claims alleged by Ms. Duvall in this proceeding. Dowling Aff. ¶ 23, Ex. D. Over the next four and a half years Chubb paid Mr. Popich to defend TMMG. *Id.* at ¶ 24. However, unbeknownst to TMMG, during that same four-and-a-half-year period, Mr. Popich was not just representing TMMG in this case; he also was representing *Chubb*. *Id.* at ¶¶ 25-37. In fact, it was not until *after Judge Kultgen had issued her Decision and Order in October of 2023* that TMMG first learned that Chubb itself was a separate party to these proceedings, that Mr. Popich was representing Chubb in them, and that Mr. Popich

---

[2] In TMMG *and Chubb*'s Combined Brief to Judge Kultgen, TMMG's (and Chubb's) counsel at the time actually stated on the record that *the Chubb Policy did not provide coverage* for the work that led to Mr. Duvall's fatal heart attack. *See* Brief of The McHenry Management Group, Inc., ("TMMG"), and Chubb Insurance Company/Ace American Insurance Company ("ACE/Chubb") filed December 1, 2022. (A true and correct copy is attached as **Exhibit 2**.) As discussed in more detail, this is not and never has been *TMMG*'s position. TMMG's position is that the DBA Policy Chubb issued to TMMG should be interpreted to provide coverage for Ms. Duvall's claim.

had been arguing—ostensibly on TMMG's behalf—that Chubb afforded TMMG no coverage for Ms. Duvall's claim. *Id.* In short, only after Mr. Popich had succeeded in obtaining *for Chubb* the relief *Chubb* was seeking in this case (relief directly adverse to TMMG's interests) did TMMG discover that the lawyer it had thought had been looking out for TMMG's own interests in this case actually had been representing *Chubb* from the start.[3]

Significantly, at no time before November of 2023 did Chubb or Mr. Popich identify to TMMG the obvious and irreconcilable conflict of interest that existed in his representing both TMMG and Chubb in this case. *Id.* at ¶¶ 28-30. Likewise, at no time did Mr. Popich seek a conflict waiver from TMMG. *Id.* at ¶ 31. And at no time did Chubb or Mr. Popich advise TMMG that it should secure independent counsel to protect its interests in this case. *Id.* at ¶ 32. Instead, Mr. Popich led TMMG to believe that he was *TMMG*'s counsel, and *only TMMG*'s counsel, and that he was pursuing *TMMG*'s best interests unreservedly in this case.

The foregoing notwithstanding, Judge Kultgen's Decision and Order makes it unambiguously clear that Mr. Popich was not pursuing *TMMG*'s own interests in regard to Chubb's insurance coverage in this case. *See Duvall*, Case No. 2018-LDA-00591, slip op. at 16 (ALJ Oct. 13, 2023) ("TMMG also contends its Defense Base Act insurance policy with Chubb did not cover Decedent's work in Croatia. . . ."). To be sure, Mr. Popich actively was arguing that the Chubb Policy *did not cover* the claim Ms. Duvall was making against TMMG. That is a position seeking an outcome decidedly favorable for *Chubb*, but plainly *not* in the best interest of TMMG.

---

[3] TMMG learned this from the undersigned, only after TMMG retained new counsel to advise and represent its interests once it learned of Judge Kultgen's October 2023 Decision and Order ruling, *inter alia*, that Chubb afforded TMMG no coverage for Ms. Duvall's claim.

6

The foregoing conflict of interest certainly was something about which Mr. Popich had been aware for years.  In August and November of 2019, Mr. Popich had been warned by Ms. Duvall's counsel in this case—repeatedly, and in writing—that his representing both Chubb and TMMG presented a conflict of interest and that TMMG ought to be advised to obtain separate counsel in these proceedings.  Dowling Aff. ¶ 33, Exs. E-F.  Indeed, as early as December 31, 2019, Mr. Popich himself, plainly aware of his ethical dilemma, included the following language in TMMG's *and Chubb*'s Motion to Continue Formal Hearing and Memorandum in Support (after first explaining that, in his view, Chubb did not provide coverage to TMMG for this claim): "This presents a potential conflict for the undersigned counsel as counsel was retained by Chubb to defend the parties until the coverage issue was resolved (under a reservation of rights).  Now that there is confirmation of no coverage, *TMMG may/will need to secure other counsel . . .*"  *See* TMMG's and Chubb's Mot. to Continue Formal Hr'g and Mem. in Supp. filed on December 31, 2019 (emphasis added).  (A true and correct copy of which is attached hereto as **<u>Exhibit 4</u>**.)  Then, in January of 2020, Mr. Popich advised *Chubb*'s agent that "we'll have to advise TMMG of the coverage issue at some point *as they will need to secure counsel*."  Dowling Aff. ¶ 34, Ex. G.  However, despite the foregoing, at no time did Mr. Popich or Chubb ever advise TMMG of the conflict that was so obvious to him and Ms. Duvall's counsel, nor did Mr. Popich or Chubb warn TMMG that it would need to "secure other counsel" in this case.

Over the last four and a half years, TMMG was left almost entirely in the dark about what Mr. Popich was doing to defend its interests in this case.  For example, TMMG had no idea until just recently that Mr. Popich had attended a mediation session in this case—again, purportedly on TMMG's behalf—in February of 2021.  *Id.* at ¶¶ 35-36.  Similarly, TMMG was not aware that Mr. Popich had failed to make *any effort* to defend the ALJ's April 26, 2021 Decision and Order

Denying Benefits, *Kimberly Duvall, v. Mi-Tech, Inc., et al.*, Case No. 2018-LDA-00591, slip op. (Apr. 26, 2021)—a Decision that was entirely favorable to TMMG—when it was appealed to the Benefits Review Board. *Id.* at ¶ 37. In fact, Mr. Popich submitted no briefing, made no argument, and did not even enter an appearance before the Board in support of that earlier ALJ decision deciding this case in TMMG's favor. *Id.*

As an attorney admitted to practice in Louisiana, Mr. Popich is bound by that state's Rules of Professional Conduct. Rule 1.7 of the Louisiana Rules of Professional Conduct defines a concurrent conflict of interest as one that exists if: "(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . or a third person. . . ." Here, Mr. Popich's representation of both Chubb (the insurer) and TMMG (the insured) were directly adverse to each other on at least one crucial issue: whether TMMG's Insurance Policy with Chubb provided Defense Base Act coverage for Ms. Duvall's claim. Obviously, it would be in *Chubb's* best interest for the Policy *not* to provide coverage for Ms. Duvall's claim. Conversely, it would be in *TMMG's* best interest for the Policy *to* provide coverage in the event Ms. Duvall's claim was successful. Unfortunately for TMMG, that interest was never advanced in presenting TMMG's case to Judge Kultgen by *TMMG's* (and Chubb's) common counsel, Robert Popich. Because of that, TMMG respectfully requests that the Board consider that interest and allow it to present its own argument in favor of coverage, despite it being presented on TMMG's behalf now, for the first time, in this appeal.

## II.    TMMG's Policy with Chubb provided Defense Base Act coverage to TMMG for Ms. Duvall's claim.

The Policy provides coverage for Ms. Duvall's claim against TMMG. The Administrative Law Judge is required to make findings necessary to determine the responsible carriers for a claim.

*See Sans v. Rodd Shipyards Corp.*, 19 BRBS 24 (1986). Therefore, when necessary, the Administrative Law Judge may adjudicate insurance disputes, even when those disputes require him/her to interpret state-created contract rights. *See e.g.*, *Shaubert v. Omega Services Indus., Inc.*, 31 BRBS 24 (1997); *Rodman v. Bethlehem Steel Corp.*, 16 BRBS 123, 125-126 (1984); *Valdez v. Bethlehem Steel Corp.*, 16 BRBS 143 (1984); *Brady v. Hall Bros. Marine Corp. of Gloucester*, 13 BRBS 854 (1981); *Droogsma v. Pensacola Stevedoring Co., Inc.*, 11 BRBS 1 (1979).

TMMG is a Virginia Corporation with offices in Chesapeake, Virginia. Dowling Aff. ¶ 4. The Policy issued by Chubb to TMMG was issued to TMMG's broker, also located in Virginia. *Id.* at ¶ 5. Therefore, given that the Policy was delivered to TMMG in Virginia, Virginia law applies to this Board's interpretation of it. *See Res. Bankshares Corp. v. St. Paul Mercury, Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (citing *Seabulk Offshore Ltd. v. Am. Home Assurance Co*, 377 F.3d 408-419 (4th Cir. 2004); *Buchanan v. Doe*, 246 Va. 67, 70, 431 S.E.2d 289, 291 (1993)).

The United States District Court for the Eastern District of Virginia summarized Virginia's interpretation of insurance policies in *Evanston Ins. Co. v. Harbor Walk Dev't., LLC*, 814 F.Supp. 365- 643-44 (E.D.Va. 2011).

> "'Courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document.'" *Seals v. Erie Ins. Exchange*, 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009) (quoting *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993)). "[A] court must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy." *Blue Cross & Blue Shield v. Keller*, 248 Va. 618, 626, 450 S.E.2d 136, 140 (1994). "When the terms in a contract are clear and ambiguous, the contract is construed according to its plain meaning." *PMA Capital Ins. Co. v. U.S. Airways, Inc.*, 271 Va. 352, 359, 626 S.E.2d 359, 373 (2006) (citation omitted). It is not the function of the Court to "'make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer.'" *Keller*, 248 Va. at 636, 450 S.E.2d at 140 (quoting *Pilot Life Ins. Co. v. Crosswhite*, 206 Va. 558, 561, 145 S.E.2d 143, 145 (1965)).

9

However, "because insurance companies typically draft their policies without the input of the insured, the companies bear the burden of making their contracts clear." *Res. Bankshares Corp.*, 407 F.3d at 636. "Accordingly, if an ambiguity exists, it must be construed against the insurer." *Id.* (citations omitted). A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning." *Id.* (citation omitted). "In determining whether the provisions are ambiguous, we give the words employed their usual, ordinary, and popular meaning." *Nextel Wip Lease Corp. v. Saunders*, 276 Va. 509, 516. 666 S.E.2d 317, 321 (2008) (citation omitted). "An ambiguity, if one exists, must be found on the face of the policy," *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 233-34, 415 S.E.2d 131, 134 (1992) (citation omitted), and "courts must not strain to find ambiguities." *Res Bankshares Corp.*, 407 F.3d at 636 (citations omitted). "[C]ontractual opinions are not ambiguous merely because the parties disagree about their meaning." *Nextel Wip*, 276 Va. at 516, 666 S.E.2d at 321.

The Policy issued by Chubb provided coverage to TMMG from March 27, 2017 through March 28, 2018. Dowling Aff. ¶ 7, Ex. A. Mr. Duvall died on September 27, 2017, within the period of coverage provided under the Policy. *Id.* at ¶ 22. The Policy includes five (5) major provisions that, when read in conjunction, can lead this Board to but one conclusion, that the Policy provides coverage for Ms. Duvall's claim against TMMG.

First, the Policy's Information Page provides:

3. A. Workers Compensation Insurance: Part One of the policy applies only to those **contracts or projects in the countries shown in the Schedule set out in the Defense Base Act Coverage Endorsement**, and only if covered under the Defense Base Act (42 USC Sections 1651-1654), any amendment to that law that occurs during the policy period, and the provisions of the Longshoremen's and Harbor Workers' Compensation Act that apply to the Defense Base Act.

*Id.* at ¶ 7, Ex. A. p. 4 (emphasis added).

Second, Page One of the Policy states:

D. Locations

This policy covers **all of your contracts or projects in the specified countries listed in the Defense Base Act Coverage Endorsement** unless you have other insurance or are self-insured for such workplaces.

*Id.* at ¶ 7, Ex. A. p. 5 (emphasis added).

10

Third, Part Four of the Policy contemplates that Chubb could be liable for employees of *uninsured subcontractors* and provides a method for assessing premiums associated with such liability:

C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration which means "wages" as defined in 33 U.S.C. 902(13) of:

    1. all your officers and employees engaged in work covered by this policy; **and**

    2. **all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy including uninsured subcontractors working under a contract or project listed in the Defense Base Ace Coverage Endorsement.** If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. You shall endeavor to provide us with all relevant payroll and/or contract price information as practicable.

[…].

*Id.* at ¶ 7, Ex. A. p. 11 (emphasis added).

Fourth, Part One of the Policy acknowledges various statutory provisions under which Chubb may be liable.

[…]

    2. We are directly and primarily liable to any person entitled to benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

    3. Jurisdiction over you is jurisdiction over us for purposes of the Defense Base Act law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.

[…]

> 5.  Terms of this insurance that conflict with the Defense Base Act law are changed by this statement to conform to that law.

*Id.* at ¶ 7, Ex. A. p. 7.

Fifth, the Policy includes a Defense Base Act Contract and/or Project Endorsement, which provides:

> Notwithstanding anything to the contrary contained within the policy to which this endorsement is attached, it is hereby understood and agreed that the policy at **GENERAL SECTION** is amended to include the following:
>
> E.  Any coverage provided by the policy for Defense Base Act coverage shall only apply to those **contracts and/or projects listed or identified in the Schedule below**, unless otherwise amended by endorsement.
>
> F.  You shall notify us, in writing, of all work you perform under any **contract or project that is subject to the Defense Base Act, and that is not identified upon the Schedule**. You must submit all underwriting information necessary to evaluate whether we will insure such contract or project under the policy. We retain the right to review such information and to determine whether to extend coverage and charge additional premium, as we deem necessary.

**Schedule**

| Provide Description of Operations, Country(s) & Contract Number(s) |
| --- |
| Description of Operations: SMART Inspections<br>Country(s): Philippines, Diego Garcia, United Arab Emirates, **Croatia**<br>Contract Number(s): N00033-14-D-8005 (Dept of Navy) |

All other terms and conditions of this policy remain unchanged.

*Id.* at ¶ 7, Ex. A. p. 14 (emphasis added).

Critically, the Schedule does not identify any "project" or "contract" by name. *Id.* Instead, SMART Inspections are identified as a Description of Operations, and N00033-14-D-8005 is identified as a Contract Number with no contract identified in the Schedule. *Id.* However, TMMG's SMART Inspections work had no relationship to Contract No. N00033-14-D-8005. *Id.*

12

at ¶¶ 10-12.  Rather that contract was for the provision of information technology services, not SMART Inspections work. *Id.* at ¶ 11.  Thus, it is TMMG's position (and Chubb's position argued below) that both TMMG's "SMART Inspections" work *and* any work it performed in furtherance of Contract Number N00033-14-D-8005 are covered by the Policy.[4]  The logical extension of that reasonable interpretation of the Policy is that it provided DBA coverage not *just for SMART Inspections work* performed in the Philippines, Diego Garcia, United Arab Emirates, or Croatia under Contract Number N00033-14-D-8005, but actually provided DBA coverage for: (1) SMART Inspections work; (2) work being performed in the Philippines, Diego Garcia, United Arab Emirates, and/or Croatia; *and* (3) work being performed in furtherance of Contract No. N00033-14-D-8005 (Dept of Navy).  This interpretation of the Policy is the only way to give full meaning to the entire contract, which plainly declares: "This policy covers *all of your contracts or projects in the specified countries listed in the Defense Base Act Coverage Endorsement* unless you have other insurance or are self-insured for such workplaces."  Dowling Aff. ¶ 7, Ex. A, p. 5 (emphasis added).  It is undisputed that TMMG did not have any other insurance that would have provided Defense Base Act Coverage in Croatia, and that TMMG was not approved as a self-insured employer for Defense Base Act purposes.  Thus, by its own terms, the Policy covered *all* of TMMG's contracts or policies in Croatia—including the one on which Mr. Duvall was working when he died.

To be sure, the most reasonable and consistent reading of the Policy under Virginia law leads directly to the conclusion that the Policy provided coverage for, conjunctively, SMART Inspections work, work being performed in the countries listed on the Endorsement's Schedule,

---

[4] *See* Ex. 2 at 17 (Arguing that Chubb's DBA Policy covered both TMMG's SMART Inspections work and work performed pursuant to Contract Number N00033-14-D-8005).

*and* IT work being performed under Contract No. N00033-14-D-8005. Mr. Duvall was performing work in Croatia at the time of his death. *Id.* at ¶¶ 15, 19, 22. Croatia was one of the four countries listed on the DBA Endorsement. *Id.* at ¶ 7, Ex. A, p. 14. TMMG had a connection, through a contract or project, with the work being performed by Mr. Duvall, an employee of Mi-Tech, at the Viktor Lenac Shipyard aboard USS MOUNT WHITNEY. *Id.* at ¶¶ 13-15, 19-21. While Mr. Duvall was not an employee of TMMG, he was an employee of a purported uninsured subcontractor, Mi-Tech. *Id.* at ¶¶ 14-16. Accordingly, it is TMMG's position that the Policy, consistent with its own language that it covers ***all*** of TMMG's contracts or projects in the Philippines, Diego Garcia, United Arab Emirates, and Croatia, clearly affords coverage for Ms. Duvall's claim against TMMG for her husband's work-related death overseas.

Moreover, if there is any ambiguity in the Policy's language, it should be construed against the insurer and *in favor of coverage* for the insured. *See Evanston Ins.*, 814 F.Supp. at 643-44 (E.D.Va. 2011) (quoting *Res. Bankshares Corp.*, 407 F.3d at 636). "A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning." *Id.* (citation omitted). Here, *TMMG* argues that there is but one reasonable meaning and that is that the Policy issued by Chubb to TMMG affords TMMG DBA coverage for Ms. Duvall's claim. However, even if the Board were to find that the provisions of the Policy were capable of more than one reasonable meaning, this Board should still find in favor of TMMG and find that coverage exists because the Policy on is ambiguous on its face. Either way, the ALJ's finding that the Policy did *not* provide coverage for this loss simply is incorrect as a matter of law. Accordingly, this Board should overturn that portion of the ALJ's conclusion and remand it for further proceedings, consistent with Chubb's DBA Policy providing TMMG coverage for Ms. Duvall's claim.

## CONCLUSION

14

For the reasons stated above, The McHenry Management Group, Inc. respectfully requests that the Board reverse as much of the ALJ's finding that the DBA Policy issued by Chubb to TMMG does not afford coverage for Ms. Duvall's claim for death compensation benefits as a matter of law.

Respectfully submitted this 15th day of December 2023.

Dated:  December 15, 2023                    The McHENRY MANAGEMENT GROUP, INC.

                                             By:  */s/ Christopher A. Abel*
                                                  Christopher A. Abel
                                                  Virginia State Bar No. 31821
                                                  Heather R. Pearson
                                                  Virginia State Bar No. 97157
                                                  Willcox & Savage, P.C.
                                                  440 Monticello Avenue, Suite 2200
                                                  Norfolk, Virginia 23510
                                                  Telephone:  757.628.5500
                                                  Facsimile:   757.628.5566
                                                  cabel@wilsav.com
                                                  hpearson@wilsav.com

                                                  *Counsel for Petitioner*

15

## CERTIFICATE OF FILING AND SERVICE

I certify that on December 15, 2023, the foregoing Opening Brief in Support of Petition for Review and accompanying exhibits were filed using the Benefits Review Board online filing system which sent a notice to all registered users. Additionally, a copy of the foregoing Notice of Appeal was sent via U.S. Mail to all parties in interest (including beneficiaries, employers, and carriers) and their representative at the last known address of each as follows:

MI-Tech, Inc.
P.O. Box 62499
North Charleston, SC 29419

Chubb Indemnity Insurance Co.
c/o ESIS PO Box 6560
Scranton, PA 18505

Kathleen Duvall
c/o Ralph L. Lorberbaum, Esq. and Eric R. Gotwalt, Esq.
Zipperer, Lorberbaum, Beauvais & Gotwalt, PC
4849 Paulsen Street, Suite 201
Savannah GA 31405

Ben Samuels and Mark Eckels
Boyd & Jenerette, P.A.
201 North Hogan St, Suite 400
Jacksonville, FL 32202

David Duhon
District Director
Jacksonville Suboffice of the Southern District
U.S. Department of Labor
Office of Workers' Compensation Programs
P.O. Box 8306
London, KY 40742

U.S. Department of Labor, Benefits Review Board
ATTN: Office of the Clerk of the Appellate Boards (OCAB)
200 Constitution Ave. NW
Washington, DC 20210–0001

_/s/ Christopher A. Abel_
Christopher A. Abel
Virginia State Bar No. 31821
Heather R. Pearson
Virginia State Bar No. 97157
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
Telephone:  757.628.5500
Facsimile:   757.628.5566
cabel@wilsav.com
hpearson@wilsav.com

_Counsel for Petitioner The McHenry Management Group_

17

# **EXHIBIT 1**

UNITED STATES DEPARTMENT OF LABOR

BENEFITS REVIEW BOARD

In the Matter of

Kimberly Duvall
Survivor of Edward Duvall,

v.                                                          BRB No.      EFS-BFB-2311-250914

The McHenry Management Group, Inc.              OALJ No.    2018-LDA-00591
*Petitioner - Employer*
                                                            OWCP No.   06-320344

Mi-Tech, Inc.
*Respondent - Employer*

and

Kimberly Duvall
Survivor of Edward Duvall
*Respondent - Claimant*

and

Starr Indemnity & Liability Company, and
Chubb Insurance Company
*Respondent - Carriers*

and

Director, Office of Workers' Compensation
Programs
*Respondent - Party-in-Interest*

## **AFFIDAVIT**

I, Shane Dowling, being duly sworn, submit the following Affidavit:

1.    My name is Shane Dowling, and I am over the age of eighteen (18) years old and

am competent to make this affidavit.

2.    I am a resident of Chesapeake, Virginia.

Page 1 of 7

I-2691565.1

3.      I am the Chief Executive Officer of The McHenry Management Group, Inc. ("TMMG")

4.      TMMG maintains its offices at 600 Independence Parkway, Chesapeake, Virginia, 23320.

5.      TMMG's insurance broker, BB&T Services, Inc. / McGriff Insurance Services maintains in Glen Allen, VA.

6.      TMMG is the Petitioner-Employer in the above-captioned case currently pending before the Benefits Review Board.

7.      On or about March 27, 2017, TMMG contracted with ACE American Insurance Company ("Chubb") to provide TMMG Defense Base Act Workers Compensation and Employers Liability Insurance Policy, Policy No. ENID38060387 (hereinafter, the "Policy").  A true and correct copy of the Policy is attached to this Affidavit as **Exhibit A**.

8.      The Policy includes a Defense Base Act Contract and/or Project Endorsement (hereinafter, the "Endorsement").  *See* **Exhibit A** at p. 14.

9.      That Endorsement includes the following Schedule:

| Provide Description of Operations, Country(s) & Contract Number(s) |
| --- |
| Description of Operations: SMART Inspections<br>Country(s):  Philippines,  Diego  Garcia,  United  Arab  Emirates, **Croatia**<br>Contract Number(s): N00033-14-D-8005 (Dept of Navy) |

10.     "SMART Inspections" are a type of Shipboard Testing and Inspection Surveys wherein TMMG employees board a ship, meet with the crew, walk around the ship, evaluate the material condition of the ship, and then provide planning and lifecycle assessment management to address aging ship issues.

Page 2 of 7

I-2691565.1

11.    TMMG was working as a subcontractor on Contract Number: N00033-14-D-8005 (Dept of Navy) and provided IT and administrative support.

12.    The subcontractor work TMMG performed under Contract Number: N00033-14-D-8005 (Dept of Navy) would not be described as SMART Inspections work.

13.    In January of 2017, TMMG was contacted by a representative of the Viktor Lenac Shipyard in Croatia and asked to serve as a financial intermediary between the Shipyard and Mi-Tech, Inc (Mi-Tech).  TMMG agreed to serve as a financial intermediary and entered into a commercial business agreement with the Viktor Lenac Shipyard to provide a Mi-Tech engineer to attend the USS MOUNT WHITNEY and provide supervision and assistance during work performed on the ship's SSTG 1C Turbine Rotor and Reduction Gear Assembly (hereinafter, the "Contract").  A true and correct copy of that Contract is attached hereto as **Exhibit B**.

14.    Then, in September 2017, TMMG issued a purchase order to Mi-Tech for an engineer to attend the USS MOUNT WHITNEY (hereinafter, the "Purchase Order).  A true and correct copy of that Purchase Order is attached hereto as **Exhibit C**.

15.    Over the course of this litigation, I learned that the Mi-Tech engineer selected to attend the USS MOUNT WHITNEY, pursuant to the Purchase Order, was Edward Duvall.

16.    Mr. Duvall was not an employee of TMMG.

17.    Neither the Agreement nor the Purchase Order were for SMART Inspections work.

18.    Neither the Agreement nor the Purchase Order were for work being performed pursuant to Contract Number: N00033-14-D-8005 (Dept of Navy).

19.    Throughout the course of this litigation, I learned that Mr. Duvall arrived in Croatia, pursuant to the Purchase Order, sometime in September 2017.

Page 3 of 7

I-2691565.1

20.     Pursuant to the Agreement, TMMG served as the pass-through intermediary for payments made by the Victor Lenac Shipyard to Mi-Tech.

21.     Pursuant to the Agreement, TMMG received a fee for serving as the pass-through intermediary for these payments by the Victor Lenac Shipyard to Mi-Tech.

22.     Through the course of this litigation, I learned that Mr. Duvall, died of a heart attack while in Croatia on September 27, 2017.

23.     On March 20, 2019, Greg Horvath, TMMG's former Chief Operating Officer, received a letter from Chan Saetern with Chubb North American Claims advising TMMG that a claim under the Defense Base Act had been filed against TMMG on behalf of Kimberly Duvall, the widow of Edward Duvall, under the Policy.  That letter also notified TMMG that Chubb had assigned Robert Popich of Mouledoux, Bland, Legrand & Brackett to provide a defense on behalf of TMMG under the Policy.  A true and correct copy of that letter is attached to this Affidavit as **Exhibit D**.

24.     TMMG has never received an invoice from Mr. Popich or Mouledoux, Bland, Legrand & Brackett in connection with this matter.  It is my understanding that Chubb paid Mr. Popich directly pursuant to the Duty to Defend provision in the Policy.

25.     From March 20, 2019 until October 16, 2023, it was my understanding that Mr. Popich was assigned to represent and provide a defense for TMMG, and only TMMG, in this matter.

26.     Only after receiving Judge Kultgen's Order and Decision on or about October 16, 2023, did I learn, for the first time, that Mr. Popich had been representing both TMMG and Chubb in this matter.

I-2691565.1

27.     From March 20, 2019 until October 16, 2023, I was unaware that Chubb itself had been added as a party in this litigation.

28.     From March 20, 2019 until October 16, 2023, I was unaware that Mr. Popich was representing both TMMG and Chubb at the same time in connection with this matter.

29.     At no point from March 20, 2019 through October 16, 2023, did Mr. Popich or anyone at Chubb contact me or anyone else at TMMG and notify me or my company that Mr. Popich was representing both Chubb and TMMG in connection with this matter.

30.     At no point from March 20, 2019 through October 16, 2023, did Mr. Popich or anyone at Chubb inform or advise me or anyone else at TMMG that there may be a conflict of interest in regard to his concurrent representation of both Chubb and TMMG in connection with this matter.

31.     At no point from March 20, 2019 through October 16, 2023, did Mr. Popich seek to obtain a conflict of interest waiver from TMMG.

32.     At no point from March 20, 2019 through October 16, 2023, did Mr. Popich or anyone at Chubb advise me that TMMG should consider securing independent counsel to protect its interests in this case.

33.     Only after October 16, 2023, did I learn that Mr. Popich had received multiple emails from Ms. Duvall's counsel, Eric Gotwalt, advising him that Mr. Popich's representation of both TMMG and Chubb presented a conflict of interest.  Neither I nor anyone else at TMMG were included in those emails or made aware of their contents by Mr. Popich.  A true and correct copy of that email correspondence that I have since had shared with me is attached hereto as **<u>Exhibits E-F</u>**.

34.     Only after October 16, 2023, did I learn that, on January 14, 2020, Mr. Popich had advised Chubb and Chubb's agent that Mr. Popich and Chubb will have to advise TMMG of the coverage issue at some point as they will need to secure counsel.  Neither I nor anyone else at TMMG were included in this email or aware of its contents.  A true and correct copy of that email correspondence is attached hereto as **Exhibit G**.

35.     It was not until after October 16, 2023, that I first learned that there had been a mediation session in this case in February of 2021 and that Mr. Popich participated in that mediation ostensibly on TMMG's behalf.

36.     At no time prior to October 16, 2023, did Mr. Popich inform me that there was a mediation scheduled in this case, nor did he provide me or TMMG any information about it after the 2021 mediation session concluded.

37.     It was only after October 16, 2023, that I learned that Mr. Popich did not submit any briefing, did not make any argument, and did not even enter an appearance in support of the ALJ's April 26, 2021 Decision and Order Denying Benefits, *Duvall, v. Mi-Tech, Inc., et al.*, Case No. 2018-LDA-00591, slip op. (Apr. 26, 2021) when it was appealed to the Benefits Review Board.

38.     The foregoing is true to the best of my knowledge and belief.


[SIGNATURE PAGE TO FOLLOW]

I-2691565.1

FURTHER THE AFFIANT SAYETH NOT.

_____
Shane Dowling

**COMMONWEALTH OF VIRGINIA,**
**CITY / COUNTY OF** <u>CHESAPEAKE</u>    **to wit:**

On this 15th day of December 2023, before me, a notary in and for the Commonwealth of Virginia, in the City or County aforesaid, personally appeared Shane Dowling, who:

_____ is personally known to me, or

__✓__ has produced _Passport_____ as identification, appeared before me, a notary in and for the Commonwealth of Virginia, and being duly sworn, executed the foregoing Affidavit and acknowledged the Affidavit to be his free and voluntary act and deed.

IN WITNESS WHEREOF I have hereunto set my hand and official seal, this day and year first written above.

_James Westerhold_____
Notary Public

Notary Registration Number: _7691475_____
My Commission Expires: _6/30/2024_____

NOTARY
PUBLIC
REG. #7691475
MY COMMISSION
EXPIRES
JUNE 30, 2024.
JAMES JAY WESTERHOLD
COMMONWEALTH OF VIRGINIA

Page 7 of 7

I-2691565.1

# EXHIBIT A



|  |  |
|---|---|
| Chubb | 215.640.1001 tel |
| Global Casualty | 215.640.5566 fax |
| Routing WA-11J | |
| 436 Walnut Street | |
| 11th Floor | |
| Philadelphia, PA 19106 | |

BB&T INSURANCE SERVICES INC DBA
1 COLUMBUS CENTER
VIRGINIA BEACH, Virginia 23462

RE: The McHenry Management Group
    ENI D38060387
    Policy Term From: 03/27/2017 To: 03/27/2018

Dear Charvaughn Carmack:

Enclosed is the Policy for the above named insured.

Our account team at Chubb would like to thank you for choosing us to service your client's needs.

Included with this letter and the DBA Policy are the following documents to be shared with the Policyholder:

- Premium Payments Procedures

- Claim Reporting Procedures

- Chubb's Privacy position, required by law to be provided to Policyholders with each new business policy or each renewal term change

- Advisory Notice to Policyholders on United States Office of Foreign Assets Control requirements regarding trade-related sanctions against certain designated foreign countries and Specially-Designated Nationals. This advisory is provided as a courtesy. The Defense Base Act Policy includes a Trade or Economic Sanctions Endorsement.

Chubb, with offices in 18 cities, is the U.S.-based retail operating division of the Chubb Companies, a global leader in property and casualty insurance and reinsurance that serves a diverse group of clients. Rated A+ (Superior) by A.M. Best Company and A+ (Strong) by Standard & Poor's, Chubb conducts business on a worldwide basis in more than 140 countries.

Our goal is to provide you and your client with continuous quality service. After reviewing your document(s), if further assistance is needed, contact your DBA underwriter.

Contact information:
Underwriter: Kerry Battersby
Multinational Account Specialist: DeAna Neuharth



# FORMS AND ENDORSEMENTS
## SUMMARY PAGE

| | |
|---|---|
| **COMPANY NAME:** | ACE American Insurance Company |
| **NAMED INSURED:** | The McHenry Management Group |
| **POLICY NUMBER:** D38060387 | **DECLARATIONS EFFECTIVE:** 03/27/2017 |

This policy consists of the following forms and endorsements attached to this policy at inception:

IT8003 05-2014    Defense Base Act Workers Compensation and
Employers Liability Insurance Signature Page
IT8004 06-2013    Defense Base Act Workers Compensation and
Employers Liability Insurance Information Page
IT8005 11-2010    Defense Base Act Workers Compensation and
Employers Liability Insurance Policy
IT8020 06-2013    Defense Base Act Contract and/or Project Endorsement
IT8021 11-2010    Defense Base Act Mandatory Terms Endorsement
IT8023 11-2010    Minimum Earned Premium Endorsement
IT8027 11-2010    Supplemental Repatriation Endorsement
IT8028 11-2010    Trade or Economic Sanctions Endorsement

The Coverage Forms and endorsements listed above and attached, complete the above numbered policy.



# DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

By signing and delivering the policy to you, we state that it is a valid contract when counter-signed by our authorized representative.

**ACE AMERICAN INSURANCE COMPANY**

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

# CHUBB®

## DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE INFORMATION PAGE

### INSURING COMPANY: ACE AMERICAN INSURANCE COMPANY

1. Named Insured: The McHenry Management Group
   (the "First Named Insured")
   Mailing   600 Independence Pkwy, Suite 105
   Address: Chesapeake, Virginia 23320

   Policy Number:      ENI D38060387

   ☐ New   ☒ Renewal of: ENI D38078525

☐ Individual          ☐ Partnership          ☒ Corporation

DESCRIPTION OF WORK:     SMART Inspections

2. Policy Period From: 03/27/2017          Policy Period To:03/27/2018
   12:01 A.M. Standard time at the insured's mailing address

3. A. Workers Compensation Insurance: Part One of the policy applies only to those contracts or projects in the countries shown in the Schedule set out in the Defense Base Act Coverage Endorsement, and only if covered under the Defense Base Act (42 USC Sections 1651 – 1654), any amendment to that law that occurs during the policy period, and the provisions of the Longshoremen's and Harbor Workers' Compensation Act that apply to the Defense Base Act.

   B. Employers Liability Insurance: Part Two of the policy applies to work in each location listed in A. The limits of our Liability under Part Two are:

   | | | |
   |---|---|---|
   | Bodily Injury by Accident | $1,000,000 | each accident |
   | Bodily Injury by Disease | $1,000,000 | each employee |
   | Bodily Injury by Disease | $1,000,000 | policy limit |

   C. Refer to the Summary, the last page of your policy, for list of endorsements and schedules included.

4. PREMIUM DETERMINATION

   The premium for this policy will be determined by our Manual of Rules, Classifications, Rates and Rating Plans. All information required below is subject to verification and change by audit, unless specified here:

   ☒ NOT SUBJECT TO AUDIT          ☐ SUBJECT TO AUDIT

   ☒ DIRECT BILL          ☐ AGENCY BILL

   | CLASSIFICATIONS | PAYROLL Estimated Total Annual Remuneration | RATE Per $100. Of Remuneration | PREMIUM Estimated Annual Premium |
   |---|---|---|---|
   | U.S. Nationals | $40,000 | $3.50000 | $6,500 MP |
   | Third Country Nationals | Not covered | | |
   | Local Nationals | Not covered | | |
   | Other | | | |

   No premium charge has been made for War-Risk Hazard, it being understood that the United States Government self-insures the exposures falling under the provisions of the "War Hazards Compensation Act."

   Producer:          Minimum Premium: $6,500          Total Estimated Annual Premium $6,500

   BB&T INSURANCE SERVICES INC DBA          Deposit: $
   1 COLUMBUS CENTER
   VIRGINIA BEACH, Virginia 23462



# DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows:

**GENERAL SECTION**

### A. The Policy

This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in the Item 1 on the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

### B. Who Is Insured

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

### C. Workers Compensation Law

Workers Compensation Law means the workers or workmen's compensation law and occupational disease law as extended by the provisions of the Defense Base Act and all laws amendatory thereof or supplementary thereto which may be or become effective while this policy is in effect It does not include the provisions of any laws that provide non-occupational disability benefits.

### D. Locations

This policy covers all of your contracts or projects in the specified countries listed in the Defense base Act Coverage Endorsement unless you have other insurance or are self-insured for such workplaces.

**PART ONE – WORKERS COMPENSATION INSURANCE**

### A. How This Insurance Applies

This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1.  Bodily injury by accident must occur during the policy period; and

2.  Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

### B. We Will Pay

We will pay promptly when due the benefits required of you under the Defense Base Act.

**C. We Will Defend**

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

**D. We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend.

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

**E. Other Insurance**

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

**F. Amounts You Shall Pay**

You are responsible for any payments in excess of the benefits regularly provided by the workers compensation law including those required because:

1. of your serious and willful misconduct;

2. you knowingly employ an employee in violation of law;

3. you fail to comply with a health or safety law or regulation; or

4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers compensation law; or

5. any fines and/or penalties assessed by the Department of Labor for your failure to report claims in accordance with the Law.

If we make any payments in excess of the benefits regularly provided by the workers compensation law on your behalf, you will reimburse us promptly.

**G. Recovery From Others**

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

**H. Statutory Provisions**

These statements apply where they are required by law.

1. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.

2. We are directly and primarily liable to any person entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

3. Jurisdiction over you is jurisdiction over us for purposes of the Defense Base Act law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.

4. This insurance conforms to the parts of the Defense Base Act law that apply to:

   a. benefits payable by this insurance;

   b. special taxes, payments into security or other special funds and assessments payable by us under this law.

5. Terms of this insurance that conflict with the Defense Base Act law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

## PART TWO – EMPLOYERS LIABILITY INSURANCE

**A. How This Insurance Applies**

This employer's liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you; and

2. The employment must be necessary or incidental to your work on contracts or projects in the countries listed on the Defense Base Coverage Endorsement; and

3. Bodily injury by accident must occur during the policy period; and

4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period; and

5. If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America.

**B. We Will Pay**

We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;

2. for care and loss of services; and

3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee; provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and

4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

## C. Exclusions

This insurance does not cover:

1. liability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner;

2. punitive or exemplary damages because of bodily injury to an employee employed in violation of law;

3. bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;

4. any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

5. bodily injury intentionally caused or aggravated by you;

6. bodily Injury occurring within the United States of America unless covered under the "Workers' Compensation Law" and Occupational Disease Law as extended by the provisions of the DEFENSE BASE ACT;

7. damages arising out of the coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions;

8. bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950), the Nonappropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), or any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws other than Defense Base Act;

9. bodily injury to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws;

10. bodily injury to a master or member of the crew of any vessel;

11. fines or penalties imposed for violation of federal or state law; and

12. damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued hereunder, and any amendments to those laws.

13. Injury to a master or member of the crew of any vessel.

**D.  We Will Defend**

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

**E.  We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the limit of our liability under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

**F.  Other Insurance**

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

**G.  Limits of Liability**

Our liability to pay for damages is limited. Our limits of liability are shown in Item 3.B. of the Information Page and include expenses and costs paid by us in relation to our duty to defend. They apply as explained below:

1. Bodily Injury by Accident. The limit shown for "bodily injury by accident-each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

   A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2. Bodily Injury by Disease. The limit shown for "bodily injury by disease-policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The

limit shown for "bodily injury by disease-each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3.  We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

**H.  Recovery From Others**

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and help us enforce them.

**I.  Actions Against Us**

There will be no right of action against us under this insurance unless:

1.  You have complied with all the terms of this policy; and

2.  The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

**Part Three – YOUR DUTIES IF INJURY OCCURS**

Tell us at once if injury occurs that may be covered by this policy. Your other duties are listed here.

1.  Provide for immediate medical and other services required by the workers compensation law.

2.  Give us or our agents the names and addresses of the injured persons and of witnesses, and other information we may need.

3.  Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.

4.  Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.

5.  Do nothing after an injury occurs that would interfere with our right to recover from others.

6.  Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

**PART FOUR – PREMIUM**

**A.  Our Manuals**

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

**B. Classifications**

Item 4 of the Information Pages show the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

**C. Remuneration**

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration which means "wages" as defined in 33 U.S.C. 902(13) of:

1. all your officers and employees engaged in work covered by this policy; and

2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy including uninsured subcontractors working under a contract or project listed in the Defense Base Act Coverage Endorsement. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. You shall endeavor to provide us with all relevant payroll and/or contract price information as soon as practicable.

The term "wages", subject to 33 U.S.C. 902(13) and any changes therein, means the compensation by an employer under the contract of hiring in force at the time of the injury, including the reasonable value of any advantage which is received from the employer including overtime, cost of living allowances, board and lodging and cash allowances. It does not include employer payment for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit, or any other employee's dependent entitlement.

**D. Premium Payments**

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

**E. Final Premium**

The premium shown on the Information Page, schedules and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is cancelled, final premium will be determined in the following way unless our manuals provide otherwise.

1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short rate cancellation table and procedure. Final premium will not be less than the minimum premium.

**F. Records**

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

**G. Audit**

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax records, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy ends. Information developed by audit will be used to determine final premium.

## PART FIVE – CONDITIONS

**A. Inspection**

We have the right, but are not obligated to inspect your workplace at any time. Our inspections are not safety inspections. They relate only to insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards.

**B. Long Term Policy**

If the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

**C. Transfer of your Rights and Duties:**

Your rights or duties under this policy may not be transferred without our written consent.

**D. Cancellation**

1.  You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2.  We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3.  The policy period will end on the day and hour stated in the cancellation notice.

4.  Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

**E. Sole Representative**

The insured first named on the Information Page will act on behalf of all insureds to change this policy, receive return premium, pay premium and give or receive notice of cancellation.

By signing and delivering the policy to you, we state that it is a valid contract when counter-signed by our authorized representative.

**ACE AMERICAN INSURANCE COMPANY**
**436 Walnut Street**
**P.O. Box 1000**
**Philadelphia, PA  19106**

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

# CHUBB®

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>The McHenry Management Group | | | Endorsement Number<br>001 |
|---|---|---|---|
| Policy Symbol<br>ENI | Policy Number<br>D38060387 | Policy Period<br>03/27/2017 to 03/27/2018 | Effective Date of Endorsement<br>03/27/2017 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

## DEFENSE BASE ACT CONTRACT AND/OR PROJECT ENDORSEMENT

**This endorsement modifies insurance provided under the following:**

## DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

Notwithstanding anything to the contrary contained within the policy to which this endorsement is attached, it is hereby understood and agreed that the policy at **GENERAL SECTION** is amended to include the following:

E.  Any coverage provided by the policy for Defense Base Act coverage shall only apply to those contracts and/or projects listed or identified in the Schedule below, unless otherwise amended by endorsement.

F.  You shall notify us, in writing, of all work you perform under any contract or project that is subject to the Defense Base Act and that is not identified upon the Schedule. You must submit all underwriting information necessary to evaluate whether we will insure such contract or project under the policy. We retain the right to review such information and to determine whether to extend coverage and charge additional premium, as we deem necessary.

**Schedule**

| Provide Description of Operations, Country(s) & Contract Number(s) |
|---|
| Description of Operations:  SMART Inspections<br>Country(s):  Philippines, Diego Garcia, United Arab Emirates, Croatia<br>Contract Number(s): N00033-14-D-8005 (Dept of Navy) |

All other terms and conditions of this policy remain unchanged.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured The McHenry Management Group | | | Endorsement Number 002 |
|---|---|---|---|
| Policy Symbol ENI | Policy Number D38060387 | Policy Period 03/27/2017 to 03/27/2018 | Effective Date of Endorsement 03/27/2017 |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

# DEFENSE BASE ACT MANDATORY TERMS ENDORSEMENT

**This endorsement modifies insurance provided under the following:**

## DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

The obligations of the policy include the Longshoremen's and Harbor Workers' Compensation Act, as extended by the provisions of the Defense Base Act, and all laws amendatory thereof or supplementary thereto which may be or become effective while this policy is in force.

The Company will be subject to the provisions of *33 U.S.C. 935.* Insolvency or bankruptcy of the employer and/or discharge therein shall not relieve the Company from payment of compensation and other benefits lawfully due for disability or death sustained by an employee during the life of the policy.

The Company agrees to abide by all the provisions of said Acts and all lawful rules, regulations, orders, and decisions of the Office of Workmen's Compensation Programs, Department of Labor, unless and until set aside, modified, or reversed by appropriate appellate authority as provided for by said Acts.

This endorsement shall not be canceled prior to the date specified in this policy for its expiration until at least 30 days have elapsed after a notice of cancellation has been sent to the District Director and to this employer.

All terms, conditions, requirements, and obligations expressed in this policy or in any other endorsement attached thereto which are not inconsistent with or inapplicable to the provisions of this endorsement are hereby made a part of this endorsement as fully and completely as if wholly written herein.

All other terms and conditions of this policy remain unchanged.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>The McHenry Management Group | | | Endorsement Number<br>003 |
|---|---|---|---|
| Policy Symbol<br>ENI | Policy Number<br>D38060387 | Policy Period<br>03/27/2017 to 03/27/2018 | Effective Date of Endorsement<br>03/27/2017 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

# MINIMUM EARNED PREMIUM ENDORSEMENT

**This endorsement modifies insurance provided under the following:**

## DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

The minimum premium for this insurance is $6,500, and this minimum will be fully earned as of the effective date of this endorsement.

All other terms and conditions of this policy remain unchanged.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>The McHenry Management Group | | Endorsement Number<br>004 |
|---|---|---|
| Policy Symbol<br>ENI | Policy Number<br>D38060387 | Policy Period<br>03/27/2017 to 03/27/2018 | Effective Date of Endorsement<br>03/27/2017 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | |

# SUPPLEMENTAL REPATRIATION EXPENSE ENDORSEMENT

**This endorsement modifies insurance provided under the following:**

## DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

In consideration of the premium charged, we will reimburse you for such additional expenses as reasonably may be incurred over and above normal transportation costs for repatriation of employees suffering from bodily injury or diseases covered by this policy (including the bodies of employees injured fatally) from the country shown in the schedule set out on the Defense Base Act Contracts and/or Projects Endorsement to the country of origin provided such injuries make repatriation necessary in the opinion of competent medical authorities.  Our liability to reimburse is limited to the amount shown with respect to any one employee and also limited to the policy limit shown below for the policy year regardless of the number of employees repatriated:

☐ $ 1,000,000 any one employee limit, or

☒ $ 1,000,000  policy limit

All other terms and conditions of this policy remain unchanged.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>The McHenry Management Group | | | Endorsement Number<br>005 |
|---|---|---|---|
| Policy Symbol<br>ENI | Policy Number<br>D38060387 | Policy Period<br>03/27/2017 to 03/27/2018 | Effective Date of Endorsement<br>03/27/2017 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

# TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

**This endorsement modifies insurance under the following:**

## DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims.

All other terms and conditions of this policy remain unchanged.



# Chubb Privacy Statement

The Chubb Companies strongly believes in maintaining the privacy of information we collect about individuals. We want you to understand how and why we use and disclose the collected information. The following provides details of our practices and procedures for protecting the security of nonpublic personal information that we have collected about individuals. This privacy statement applies to policies underwritten by the Chubb group member companies listed below.

## INFORMATION WE COLLECT

The information we collect will vary depending on the type of product or service individuals seek or purchase, and may include:

- Information we receive from individuals, such as their name, address, age, phone number, social security number, assets, income, or beneficiaries;

- Information about individuals' transactions with us, with our affiliates, or with others, such as policy coverage, premium, payment history, motor vehicle records; and

- Information we receive from a consumer reporting agency, such as a credit history.

## INFORMATION WE DISCLOSE

We do not disclose any personal information to anyone except as is necessary in order to provide our products or services to a person, or otherwise as we are required or permitted by law.

We may disclose any of the information that we collect to companies that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements.

## THE RIGHT TO VERIFY THE ACCURACY OF INFORMATION WE COLLECT

Keeping information accurate and up to date is important to us. Individuals may see and correct their personal information that we collect except for information relating to a claim or a criminal or civil proceeding.

## CONFIDENTIALITY AND SECURITY

We restrict access to personal information to our employees, our affiliates' employees, or others who need to know that information to service the account or in the course of conducting our normal business operations. We maintain physical, electronic, and procedural safeguards to protect personal information.

## CONTACTING US

If you have any questions about this privacy statement or would like to learn more about how we protect privacy, please write to us at Chubb Customer Services, P.O. Box 1000, 436 Walnut Street, WA04F, Philadelphia, PA 19106. Please include the policy number on any correspondence with us.

| | |
|---|---|
| ACE American Insurance Company | Century Indemnity Company |
| ACE Fire Underwriters Insurance Company | Illinois Union Insurance Company |
| ACE Insurance Company of the Midwest | Indemnity Insurance Company of North America |
| ACE Property and Casualty Insurance Company | Insurance Company of North America |
| Atlantic Employers Insurance Company | Pacific Employers Insurance Company |
| Bankers Standard Fire and Marine Company | Westchester Fire Insurance Company |
| Bankers Standard Insurance Company | Westchester Surplus Lines Insurance Company |
| | ESIS, Inc. |



# Chubb Producer Compensation
# Practices & Policies

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.



<u>DIRECT BILL PREMIUM COLLECTION POLICY</u>

Dear Chubb Global Casualty Customer:

An invoice/bill will be mailed separately. The client/insured is responsible for the payment.

Chubb offers several payment options as outlined below.

To pay your bill online go to <u>www.ChubbPaymentServices.com</u>
*Sign up here for recurring payments.*

To pay your bill over the phone, contact Customer Service at 1-877-490-7427
*Please have the following information ready: policy number, credit card number or for a check by phone the bank account number and bank routing code.*

To pay your bill by mail send to:

CHUBB
DEPT CH 14089
PALATINE, IL 60055-14089
*Please make check payable to Chubb and include your policy number on the check along with the tear off coupon on your invoice.*

**OVERNIGHT MAIL**

<u>PAYABLE TO:</u>

<u>CHUBB</u>
ACE American Insurance Company
5505 N. CUMBERLAND AVE
SUITE 301
CHICAGO, IL  60656-14089
ATTN: BOX #14089

FOR ANY QUESTIONS REGARDING YOUR INVOICE,
PLEASE CALL OUR CUSTOMER SERVICE DEPARTMENT AT 1-877-490-7427.

CUSTOMER SERVICE REPRESENTATIVES ARE AVAILABLE DAILY 9:00 AM – 5:00 PM EST



# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# DEFENSE BASE ACT WORKERS COMPENSATION AND EMPLOYERS LIABILITY CLAIM REPORTING

## Ease of Use Claim Reporting:

The employer is required to complete and submit the Employer's First Report of Injury Form (LS-202) form to the Department of Labor within 10 days of being notified of the accident. Failure to file within the required timeframe may subject the employer to civil penalties up to $11,000. Such penalties are assessed by the District Director. Such failure also extends the time limitation for an employee to file a claim. The time to file a claim does not begin to run until the employer has filed the Form LS-202 with the Office of Workers' Compensation Claims (OWCP).

Complete the LS-202 (which can be found on the Department of Labor website at http://www.dol.gov/owcp/dlhwc/lsforms.htm. The mailing address for the DOL is noted below.

**Report the Claim to Chubb/ESIS**
**Claim Reporting Options:**

DBA claims can be submitted to Chubb by using either of the following methods:

1. Online submission via Claim Capture

   - 1st Time Users: Please email www.dba.claims@esis.com
   - Provide your First & Last Name, Phone Number and Email Address as well as Company Name
   - User ID and Passwords will be sent
   - Once the account is set up: Go to: www.claimcapture.com
   - Enter your login information and follow the instructions to submit your claim to Chubb/ESIS Claims
   - You will receive a confirmation email with a copy of the LS-202 for your records and submission to the Department of Labor

2. Alternative Submission Methods

   Scan or print the completed LS-202 and submit it to Chubb Claims using email or fax (below).

   - Email: dba.claims@esis.com (this is the most expedient method)
   - Fax: 1.800.336.0408 within the US or 1.813.281.1354 outside of the US
   - Mailing address for any items which cannot be sent by e-mail or faxed:
         ESIS - DBA Claims
         P.O. Box 6560
         Scranton, PA. 18505-6560

3. Telephonic Claim Reporting

   - Domestic Phone Number: 1-888-735-4615
   - International Phone Number : 1-847-794-1799
   - Please notify the customer service rep you are calling to report DBA claim

**Mail a copy of the LS 202 to the Department of Labor:**
U.S. Department of Labor
P.O. Box 249
New York, NY  10014-0249

**Claims Questions**
The Defense Base Act Claims Department is located in Tampa, Florida.  To contact the claims department during normal business hours, call **1.800.367.5189** (press 5) and you will be assisted by a customer service representative.

**Emergency After Hour Assistance**
For emergency medical evacuations and for after hour urgent claim matters, dial:
- 1.866.373.0633 within the US, or
- 1.267.350.6483 outside of the US

**NOTICE TO EMPLOYEES**
Nonappropriated Fund Instrumentalities Act

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



Employer
The McHenry Management Group

This employer is insured to provide compensation benefits (including medical and hospital care) to its employees, or monetary benefits to eligible survivors, in case of work-connected injury, occupational illness or death, in accordance with the provisions of the above law and rules of the Office of Workers' Compensation Programs.

# WHAT TO DO WHEN INJURED AT WORK

- NOTIFY YOUR EMPLOYER IMMEDIATELY. If possible, complete Form LS-201, Notice of Injury, available from your employer. You should give notice of injury to the following person(s):

  _____

  _____

- MEDICAL TREATMENT. Request authority (Form LS-1) from your employer for treatment by the physician you choose. You may not select a physician that is not authorized by the Office of Workers' Compensation Programs to provide medical care under the Act. Your employer has a list of physicians who are not authorized in an emergency or if unable to contact your employer, go to the nearest hospital or physician, but be sure to let your employer know as soon as possible.

- DISABILITY. If you are disabled more than 3 days, contact your employer or the insurance company indicated below for payment of compensation, payable 14 days after your employer has knowledge of injury.

- IMPORTANT! The law requires you to give written notice of injury (Form LS-201) to your employer and to the Office of Workers' Compensation Programs within 30 days. Additional time may be allowed for certain hearing loss and occupational disease claims. The address of the Office of Workers' Compensation Programs District Office for this area is:

  _____

  _____

| Insurance Carrier for This Employer: | For Further Assistance and Information: |
|---|---|
| Name<br>ACE American Insurance Company | On request, the Office of Workers' Compensation Programs will explain benefits and proceedings under the above Act. In addition the Office of Workers' Compensation Programs will inform employees receiving compensation about medical and vocational rehabilitation services, and will assist in obtaining such services. |
| Address<br>436 Walnut Street | |
| Philadelphia, PA 19106 | |
| Telephone<br>1 800 204-0518 | |
| Policy Number  D38060387 | Expiration Date of Policy 03/27/2018 |
| Authorized Signature for the Employer | Date Signed |

**This Notice must be posted and maintained in a conspicuous place in and about the place of business.**
**(33 U.S.C. 934)**

**Important Notice**

Section 31 (a) (1) of the Longshore Act, as extended to the Nonappropriated Fund Instrumentalities Act, 33 U.S.C. 931 (a) (1), provides as follows: Any claimant or representative of a claimant who knowingly and willfully makes a false statement or representation for the purpose of obtaining a benefit or payment under this Act shall be guilty of a felony, and on conviction thereof shall be punished by a fine not to exceed $10,000, by imprisonment not to exceed five years, or by both.

# EXHIBIT B

## CONTRACT No. 2017/106

Agreement made on 23th January 2017

Between

**Shipyard VIKTOR LENAC d.d.**, with registered office in Martinšćica bb, Rijeka, Croatia, an enterprise organized and existing under the laws of Republic of Croatia (herein after referred to as "COMPANY"), represented by Mr. Aljoša Pavelin, President of the Board

and

**The McHenry Management Group-TMMG** with registered office in 600 Independance Parkway, Suite 105, Chesapeake, VA 23320, USA, an enterprise organized and existing under the laws of USA (herein after referred to as "CONTRACTOR"), represented for this contract by Mrs. Amy Sanchez.

### Article 1: Subject of the contract

This Contract defines terms and conditions where COMPANY orders and CONTRACTOR agrees to provide MI-Tech Engineer to attend USS MOUNT WHITNEY and provide supervision and assistance during works on ship's SSTG 1C Turbine Rotor and Reduction Gear Assembly.

### USS MOUNT WHITNEY
### WO5130830

### Article 2: Scope of works

CONTRACTOR shall provide MI-Tech Engineer to attend USS MOUNT WHITNEY and provide supervision and assistance during works on ship's SSTG 1C Turbine Rotor and Reduction Gear Assembly, upon inquiry of COMPANY dated 17th January 2017 and offer of CONTRACTOR in Quotation No. 01182017MSC dated 19th January 2017 which makes an integral part of this Contract.

In order to avoid eventual delays, misunderstandings, extra cost etc. the Contractor has to submit a list of works/pre-checks that have to be done before commencement of local support. Also if any assistance is needed from the Company please advise (manpower, tools, etc.).

### Article 3: Contract value - price of the works

Contract price is based on the scope of works carried out including fulfillment of all CONTRACTOR's obligations and in accordance to the Contract terms and conditions and shall amount to:

### Price for commissioning engineer

### 36.492,46 USD

to say: (thirtysixthousandfourhundredninetytwo US dollars and fortysix cents)

Hotel accommodation and local transportation are provided by the Company.

### Article 4: Execution and completion of works

Completion of works and delivery date:

Contract start of the works shall be 26th January 2017. and completion and delivery of works shall be agreed on-site with COMPANY'S authorized representative.

### Article 5: Verification of service report

After completion of works, CONTRACTOR shall provide delivery protocol on carried out and Contract works. Delivery protocol shall be signed by COMPANY's authorized representative, Project Manager Mr.Zoran Kosić.

### Article 6: Payment terms and invoicing

Payment for the contractual services as per Article 2 of the CONTRACT shall be effected in favor of the CONTRACTOR's account, supported by signed service report:

- Net 30

Payment shall be effected on the basis of invoice issued by CONTRACTOR. Invoice shall be submitted in original plus three copies and addressed to COMPANY.

### Article 7: Notices and language

Any notices, requests and correspondence in respect to Contract herein shall be in writing, and may be served by fax or e-mail in English language.

All notices and other documents and correspondence to be submitted to CONTRACTOR shall be sent to the following address:

#### The McHenry Management Group-TMMG
Registered office in 600 Independance Parkway, Suite 105, Chesapeake, VA 23320, USA
Phone:        +1 757 410 1815
E-mail:       asanchez@tmmg.us.com
Contact person:     Amy Sanchez

All notices and other documents and correspondence to be submitted to COMPANY shall be sent to the following address:

#### Brodogradilište VIKTOR LENAC d.d.
51001 Rijeka, Martinšćica bb, P.O.Box 210
Phone:        +385 99/815-3859
E-mail:       zoran.kosic@lenac.hr
              boran.micetic@lenac.hr

Contact persons:     Zoran Kosić and Boran Mičetić

**Article 8: Closing provisions**

CONTRACT shall come to effect as of the date of signature by the parties' authorized representatives. The CONTRACT is prepared in two identical copies of which one copy retains CONTRACTOR, and one copy retains COMPANY.

Terms and Conditions applicable to this agreement are the T&Cs for Sale of Product and Services as per Quotation No. 01182017MSC dated 19th January 2017 which makes an integral part of this Contract.

For the CONTRACTOR:

Arthur S. Mahony, TMMG COO

01/24/2017

For the COMPANY:

# **EXHIBIT C**



757 410 0233   600 Independence Parkway, Suite 105, Chesapeake, VA 23320   TMMG.US.COM

## **TMMG**

600 Independence Parkway, Suite 105
Chesapeake, VA 23320
Phone 757-410-1815 | Fax 757-410-7809
Attn: Amy D. Sanchez, Contracts Manager
Email: a.sanchez@tmmg.us.com

**MI-TECH, INC.**
6685 Jet Park Road
North Charleston, SC 29406
Phone: 843-553-2743 | Fax: 843-553-5541
Attn: Bobby Mimms
Email: bobbym@mi-tech.net

# PURCHASE ORDER

The following number must appear on all related correspondence, shipping papers, and invoices:
**P.O. NUMBER: TMMGMSC2017694**
**Task Order No: 2017-694**
**USS MOUNT WHITNEY TURBINE GENERATOR SUPPORT**

| P.O. DATE | REQUISITIONER | Period of Performance | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 01 Sept 2017 | Matt McKeon | 09/06/2017 to 09/17/2017 | Destination | See Section 2.0 of PO and Section 18 of attached Terms and Conditions |

| QTY | UNIT | DESCRIPTION | | NOT TO EXCEED TOTAL |
|---|---|---|---|---|

TMMG-PURCHASE ORDER



757.410.0233    800 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG US COM

| | | RFP NO.: 532 USS MT WHITNEY REV 1 1C SSTG | |
|---|---|---|---|
| 1 | Job | STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR NINE (9) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 8 THRU SEPTEMBER 16, 2017 EXCLUDING TRAVEL TIME FOR FURTHER TESTING AND ADJUSTMENT OF THE NO. 1C SHIP'S SERVICE TURBINE GENERATOR. <br><br>A. LABOR <br>1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON <br>a. TRAVEL TIME FOR ONE (1) ROUND TRIP TO AND FROM RIJEKA, CROATIA DEPARTURE 9/6/2017 AND RETURN FROM ZAGREB, CROATIA 9/17/2017 <br><br>16 ST HOURS @ $108.00/HOUR        $1,728.00 <br>24 OT HOURS @ $162.00/HOUR       $3,888.00 <br><br>b. ONBOARD/ON SITE SERVICES - NINE (9) DAYS 9/8/2017 THRU 9/16/2017 <br>48 ST HOURS @ $108 00/HOUR       $5,184.00 <br>60 OT HOURS @ $162.00/HOUR       $9,720.00 <br>                     PRICE: $20,520.00 <br><br>B. TRAVEL AND LIVING EXPENSES <br>1. AIRFARE                 $11,024.16 <br>2. MEALS $84.00/DAY X 13 DAYS    $1,092.00 <br>3. COMMUNICATION           $403.00 <br>                 PRICE: $12,519.16 <br>       TOTAL PRICE: $33,039.00 <br><br>NOTES: <br>1. ANY ADDITIONAL COST INCURRED FOR TECHNICAL REPRESENTATIVE SERVICE AND/OR THE TRAVEL AND LIVING EXPENSES WILL BE SUBJECT TO AN ADDITIONAL PURCHASE ORDER. <br><br>2. THE ONBOARD/ON SITE QUOTED PRICE IS FOR TWELVE (12) HOURS PER DAY FOR THE NINE (9) DAYS ONBOARD/ON SITE WHETHER WORKING OR FOR STANDBY TIME WHILE WAITING FOR APPROVAL TO COMMENCE OR TO COMPLETE ANY WORK. <br><br>3. VIKTOR LENAC SHIPYARD WILL PROVIDE A SAFE AND RELIABLE VEHICLE OR RENTAL CAR TO BE DRIVEN BY THE MI-TECH TECHNICAL REPRESENTATIVE BE AVAILABLE AT THE AIRPORT IN ZAGREB FOR TRAVEL TO RIJEKA, LOCAL TRANSPORTATION AND THE TRAVEL BACK TO THE ZAGREB AIRPORT. THE CUSTOMER WILL BE RESPONSIBLE FOR ALL COST ASSOCIATED WITH THE CUSTOMER PROVIDED CAR I. E. GAS, ETC. <br><br>4. THE QUOTED PRICE FOR AIRFARE AND TRAVEL DATES ARE ONLY GOOD UNTIL 10:00 AM THURSDAY, AUGUST 31, 2017. AFTER THAT TIME THEY WILL HAVE TO BE REQUOTED AND THE DATES MAY NOT BE AVAILABLE. <br><br>5. TERMS: NET 30 | |

| | |
|---|---|
| SUBTOTAL | $33,039.00 |
| SALES TAX | N/A |
| SHIPPING & HANDLING | N/A |
| OTHER | N/A |
| **NOT TO EXCEED TOTAL** | **$33,039.00** |

TMMG-PURCHASE ORDER



757.410.0233   800 Independence Parkway, Suite 105, Chesepeake, VA 21320   TMMG US.COM

1. Seller must send 1 copy of their invoice, travel expense report and receipts to accountspayable@tmmg.us.com.

2. Seller shall invoice upon completion, submission of deliverable and acceptance by the Client. TMMG shall pay the Seller's invoices upon receipt of payment from Client or within forty-five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later. TMMG may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment.

3. This PO is in accordance with the Seller's quote number 178686 Rev 1 dated 08/30/2017; delivery method, specifications listed in the Description and ATT A Terms and Conditions.

4. Travel and living expenses are authorized. Lodging and transportation will be provided by Client.

*BY ACKNOWLEDGING RECEIPT OF THIS ORDER (OR BY SHIPPING GOODS OR PERFORMING THE SERVICES CALLED FOR BY THIS ORDER), SELLER AGREES TO THE TERMS AND CONDITIONS CONTAINED HEREIN. IT IS AGREED THAT ANY SALES CONFIRMATION OR OTHER ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS CONTAINED IN ANY ACKNOWLEDGMENT OF THIS ORDER BY SELLER ARE WAIVED BY SELLER AND SHALL BE DEEMED OBJECTED TO BY BUYER WITHOUT NEED OF FURTHER NOTICE OF OBJECTION AND SHALL BE OF NO EFFECT OR UNDER ANY CIRCUMSTANCES BINDING UPON BUYER UNLESS ACCEPTED BY BUYER IN WRITING.*

| NAME AND TITLE OF SIGNER | | NAME AND TITLE OF SIGNER | |
|---|---|---|---|
| | | Arthur S. Mahony, COO | |
| AGREED TO FOR SELLER: | DATE: 9-1-17 | AGREED TO FOR TMMG: | DATE: 09/01/2017 |
| SIGNATURE OF PERSON AUTHORIZED TO SIGN | | SIGNATURE OF PERSON AUTHORIZED TO SIGN | |



757.410.0233   600 Independence Parkway, Suite 105, Chesepeake, VA 23320   TMMG.US.COM

## TMMG
### PURCHASE ORDER GENERAL TERMS AND CONDITIONS

By accepting this Standard Form of Purchase Order (hereinafter referred to as "the Order") the Seller accepts the Terms and Conditions included herein, unless the Seller notifies The McHenry Management Group, Inc. (TMMG) (hereinafter referred to as "the Buyer") of the Seller's objections.

**1.    ACKNOWLEDGMENT AND ACCEPTANCE OF ORDER:** This Order constitutes an offer from the Buyer that is expressly limited to the Terms and Conditions contained herein. The Terms and Conditions of this Order are those that apply to the purchase of materials, items, products, services, or components (hereinafter referred to as "Goods"). All exhibits, attachments, technical specifications, drawings, notes, instructions, or information referenced in the Order are incorporated herein by reference. Acceptance of this Order by Seller shall be evidenced by Seller's signing and returning as acknowledgement copy of the Order, commencement of performance, or the timely delivery of the goods in accordance with the terms of this Order as herein specified. Commencement of performance includes any act by Seller evidencing intent to supply the Goods ordered.  This Order constitutes the entire agreement between the Seller and the buyer and may be changed or modified only by a written Change Order signed by Buyer's authorized representative.

**2.    CHANGES:** The Buyer shall have the right at any time, by written notice, in the form of a Change Order, to the Seller, to make any changes it deems necessary, including, but not limited to, changes in specifications, design, delivery, testing methods, packing or destination. If any such required changes cause an increase or decrease in the cost of or the time required for performance, an equitable adjustment shall be made in the contract price or delivery schedule, or both. Any claim by the Seller for adjustment under this clause shall be deemed waived unless asserted in writing within ten (10) days from receipt by the Seller of notice of change. Price increases, extensions of time for delivery and change in quantity shall not be binding on the Buyer unless evidenced by a form of Change Order issued and signed by the Buyer.

**3.    DELIVERY/FORCE MAJEURE:** Delivery shall be strictly in accordance with the Buyer's delivery schedule.  If Seller's deliveries fail to meet such schedule, Buyer, without limiting its other remedies, may direct expedited routing. The difference between the expedited routing and the Order routing costs shall be paid by Seller.  Furthermore, if Goods are not delivered by the date specified herein, the Buyer reserves the right, without liability, to cancel this Order as to any Goods not yet shipped or tendered, and to purchase substitute Goods and to charge the Seller for any loss incurred. Cancellation notices made by the Buyer to the Seller, shall be made in writing.  Any provisions hereof for delivery by installment shall not be construed as making the obligations of the Seller severable. The Buyer shall have the right to refuse deliveries made more than one week in advance of any delivery schedule appearing in this Order unless arrangements for such early delivery have been confirmed with the receiving party.  The Seller shall notify the Buyer in writing promptly of any delays (however caused) and of any actual potential labor dispute which delays or threatens to delay the timely performance of this Order.  If the Seller is unable to complete performance at the time specified for delivery hereunder, by reason of strikes, labor disputes, riot, war, fire, or natural disasters beyond the Seller's reasonable control, the Buyer, at its option, may elect to take delivery of Goods hereunder in its unfinished state and to pay such proportion of the contract price as the work then completed bears to the total work hereunder and to cancel this Order without liability as to the balance of the Goods covered hereunder.

**4.    TITLE AND RISK OF LOSS:** Title to any property furnished by Buyer on other than a charge basis shall, at all times, remain in Buyer's name.  Seller assumes the risk of loss or damage.  Seller agrees to procure insurance satisfactory to Buyer, insuring the full insurable value of all Buyers' property in Seller's possession against loss or damage.  Satisfactory evidence of such insurance shall be submitted to Buyer when requested.  Seller shall pay all taxes assessed against Buyer's property or its use while in Seller's possession and also file all necessary declarations and reports.  Risk of Loss shall transfer to Buyer upon Buyer's Formal Acceptance of Buyer's Property.

**5.    TAXES:** Seller agrees that the prices set forth in this Order <u>include all applicable federal, state, and local taxes</u>, including but not limited to applicable sales, use, excise, value-added, and/or similar taxes. Seller agrees to accept and use tax exemption certificates supplied by Buyer <u>only if</u> they are acceptable to the taxing authorities.  If any tax included in these prices was not required to be paid by Seller, Seller shall notify Buyer promptly and diligently pursue a refund to Buyer.

**6.    WARRANTY:** Seller warrants that Goods delivered, the packaging, labeling and sorting thereof, any installation, repair, and maintenance of Goods, and any other performance pursuant to this Order will be (a) free of infringements of property rights of third parties, including without limitation, any patent, trademark, trade name, copyright or right of publicity; (b) free from defects in material and workmanship; (c) of merchantable quality; (d) fit for the intended use of Buyer, Buyer's customers and any other intended uses of such Goods; (e) of a grade and performance in conformity with all specifications, blueprints, designs, drawings, samples, models, descriptions, instructions and other items referred to in this Order. Seller warrants that any services to be performed by Seller hereunder will be performed by Seller, as an independent contractor, in a good and workmanlike manner.  In addition to any other constructive, express or implied warranties, the Seller warrants that if Goods covered by this Order are found not to be as warranted, the Buyer may,



757.410.0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG.US.COM

by written notice to the Seller: (a) rescind this Order as to such non-conforming Goods, (b) accept such Goods at an equitable reduction in price, (c) reject such non-conforming Goods and require the delivery of suitable replacements. If the Seller fails to deliver suitable replacements promptly, the Buyer, with notice of five business days, may replace or correct such Goods and charge the Seller the additional cost occasioned the Buyer thereby, or terminate this Order for default. Cost of replacement, rework, inspection, repackaging and transportation of such corrected Goods shall be at the Seller's expense.

This warranty provision shall survive any inspection, delivery, acceptance, payment, expiration or earlier termination of this Order and such warranties shall run to the Buyer, its successors, assigns, employees, customers, and end users of the Goods. Nothing herein, however, shall limit the Buyer's rights in law or equity for damages resulting from delivery of defective goods or damage caused during the delivery of goods or provision of services. Rights, granted to the Buyer in this article entitled WARRANTY, are in addition to any other rights or remedies provided elsewhere in this Order or in Law.

**7.    PRICE WARRANTY:** Seller warrants that the price of the ordered items does not exceed the price charges by the Seller to any other customer purchasing the same items in like or similar quantities and under similar conditions of purchase.

**8.    INSPECTION AND ACCEPTANCE:** The Seller shall inspect all Goods prior to shipment to the Buyer. All Goods covered by this Order may be inspected and tested by the Buyer or its designee. If the Buyer elects, in writing, to inspect or test, successful completion of such inspection and testing shall be a prerequisite to the Buyer's acceptance of the Goods. If deemed necessary by the Buyer, the Seller shall provide without charge, all reasonable facilities and assistance for such inspection and test. Any inspection records relating to the Goods covered by this Order shall be available to the Buyer during the performance of this Order and for such longer periods as specified by the Buyer. If any Goods covered by this Order is defective or otherwise not conforming to the requirements of this Order, the Buyer may, by written notice to the Seller: (a) rescind this Order as to such non-conforming Goods, (b) accept Goods at an equitable reduction in price, (c) reject such non-conforming Goods and require the delivery of suitable replacements. If the Seller fails to deliver suitable replacements promptly, the Buyer, with advance notice of five (5) business days, may replace or correct such Goods and charge the Seller the additional cost occasioned the Buyer thereby, or terminate this Order for default. No inspection (including source inspection) test, approval (including design approval) or acceptance of Goods shall relieve the Seller from responsibility for defects or other failures to meet the requirements of this Order. Rights granted to the Buyer in this article are in addition to any other rights or remedies provided elsewhere in this Order or in Law.

**9.    BUYER'S PROPERTY IN SELLER'S POSSESSION:** All Materials, documents, software, graphic images, hardware, art, data (regardless of use), tools, special dies, molds, patterns, jigs and any other property furnished to the Seller by the Buyer or specifically paid for by the Buyer for use in the performance of this Order shall be, and shall remain the property of the Buyer; shall be subject to removal at any time upon the Buyer's demand; shall be used only in filling orders for the Buyer; shall be maintained in good order and condition and shall be clearly identified as the property of the Buyer. The Seller will permit (with reasonable accommodations, the Buyer or their designated agent full and unfettered access to the Sellers location, place of business or plant facilities for the purpose of inspecting and verifying Buyer's Property in the Sellers possession and to ensure that the Terms and Conditions incorporated herein are being adhered to. When necessary, the Buyer agrees to complete the Sellers Non-Disclosure Agreement (NDA) or Proprietary Information Exchange Agreement (PIEA) prior to requesting access. The Seller assumes all liability for loss or damage to the Buyers property. In the event data integrity has been breached or is suspected of having been compromised by anyone in any way, the Seller shall immediately notify Buyer. Notification of a breach or suspected compromise does not indemnify the Seller in any way.

**10.    PATENT INDEMNITY:** The Seller agrees to indemnify, hold harmless and defend the Buyer, its employees, directors, officers, agents and customers with respect to all claims, suits, actions and proceedings of actual or alleged infringements of any Letter, Patent, Registered or Industrial Design, Trademark or Trade Name, Trade Secret, Copyright or other protected right in any country resulting from any sale, use or manufacture of any Goods delivered hereunder and to pay and discharge all judgments, decrees, and awards rendered therein or by reason thereof and bear all expenses and legal fees (including the Buyer's) associated herewith. The Buyer reserves the right to be represented in any such action by its own counsel at its own expense.

**11.    INDEMNITY:** The Seller will indemnify, defend and hold the Buyer, its directors, officers, employees, agents, subcontractors, and customers harmless from any loss, expense, claim or damage including reasonable defense costs, arising from any claim or action based on any acts or omissions of the Seller, its employees, servants, agents or subcontractors. The Buyer reserves the right to be represented in any such action by its own counsel at its own expense.

**12.    ASSIGNMENT/SUBCONTRACTING:** The Seller shall not assign this Order, any rights under this Order, or any monies due or to become due hereunder, nor delegate or subcontract any obligations or work hereunder, without the prior written consent of the Buyer. No purported assignment or delegation by the Seller shall be binding on the Buyer without such advance written consent.



757.410.0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG.US.COM

13.    **WAIVER:** Failure of the Buyer to insist, in any instance, upon the strict performance of any provision of this Order, or to exercise any right or privilege granted to the Buyer hereunder, shall not constitute or be construed as a waiver of any such provision or right and the same shall continue in force.

14.    **PROPRIETARY INFORMATION/TITLE TO SPECIFICATIONS** All written information obtained by the Seller from the Buyer in connection with this Order and which is identified as proprietary, including, but not limited to, any specifications, art, graphic images, data (in any form), drawings, blueprints, and software programs, shall remain the property of the Buyer, shall be used by the Seller only to the extent necessary for performance of this Order, and shall not be disclosed to any third parties without prior written consent of the Buyer. The Seller shall not make or authorize any news release, advertisement, or other disclosure which shall deny or confirm the existence of this Order without prior written consent of the Buyer except as may be required to perform this Order.

15.    **SHIPPING, PACKAGING AND LABELING:** Shipping Terms shall be F.O.B. destination to Buyer's delivery location unless otherwise noted within the terms of this Order. All Goods purchased hereunder must be packed and packaged to ensure its safe delivery in accordance with good commercial practice and where incorporated, the Buyer's packaging specification. The Seller shall mark on all containers, handling and loading instructions, shipping information, part number, Order number and item number, quantity in box, shipment date, and names and addresses of the Seller and the Buyer. An itemized packing list and/or Bill of Lading must accompany each shipment. Each packing slip shall include; this Order number, quantity, item description, order date, shipping date and delivery address, but shall not include pricing information. All shipments of hazardous materials under this Order shall comply with current U.S. Department of Transportation (DOT) regulations as published in 49 CFR 100-199, and the labeling shall meet the current U. S. Occupational Safety and Health Administration (OSHA) regulations as published in 29 CFR 1910.1200, for the transporting and labeling of hazardous materials. Material Safety Data Sheets (MSDS) shall be supplied with the first shipment of all hazardous materials, and these sheets shall be resubmitted if any changes or updates, as required, are made. A second copy must be sent to the Buyer

16.    **THE SELLER AS AN INDEPENDENT CONTRACTOR:** Seller shall perform the obligations of this Order as an independent contractor and under no circumstances shall it be considered an agent or employee of the Buyer. The Terms and Conditions of this Order shall not, in any way, be construed as to create a partnership or any other kind of joint undertaking or venture between the parties hereto. The Seller expressly waives any and all rights which may or may not exist to claim any relief under the Buyer's comprehensive insurance policy, worker's compensation or unemployment benefits.

17.    **STANDARDS OF CONDUCT:** The Seller must reassign its employees, agents and subcontractors working on the Buyer's premises if any such personnel are deemed to be disruptive, dangerous, incompetent, or otherwise noncompliant with reasonable conduct guidelines and Buyer's policies and procedures. At the Buyer's request, the Seller will distribute publications supplied by the Buyer regarding the Buyer's policies, practices, and procedures, including, but not limited to, Affirmative Action and Sexual Harassment policies.

18.    **INVOICING/PAYMENTS/SET-OFFS:** After each delivery pursuant to this Order, the Seller shall send invoices including item number(s) to the Buyer's address as indicated on the face of this Order. Seller shall bear the risk of non-payment by Client for any or all of its Work. The Buyer shall pay the Seller's invoices upon receipt of payment from Client or within forty five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later, unless otherwise specified. The Buyer may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment. The Buyer shall have right at any time to set-off any amounts due to the Seller, (or any of its associated or affiliated companies) against any amounts owed by the Buyer with respect to this Order or any subsequent Order or any other contractual agreement between the parties hereto unless such set-off violates local law or regulations. Invoices older than 75 days after the delivery date will not be considered for payment.

19.    **INSURANCE AND STATUTORY OBLIGATIONS:** If any part of this Order involves the Seller's performance on the Buyer's premises or at any place where the Buyer conducts operations, or with material or equipment furnished to the Seller by the Buyer, the Seller shall take all necessary precautions to prevent injury to persons or property during the progress of such work. The Seller shall maintain public liability, personal injury, and property damage insurance and employer's liability and compensation insurance, in an amount determined by the Buyer to be appropriate, to protect the Buyer from said risks and from any statutory liabilities whatsoever arising there from. The Seller shall produce evidence of such insurance upon request by the Buyer.

20.    **COMPLIANCE WITH LAWS**

Statutory Compliance:  Seller certifies that the goods ordered were produced in compliance with all applicable requirements of Sections 6, 7, and 12 of the Fair Labor Standards Act of 1938, as amended, and of regulations and orders of the Administrator of the Wage and Hour Division issued under Section 14 thereof. This Order is subject to, and incorporates by reference, the following terms and provisions published by the Office of Federal Contract Compliance Programs, Department of Labor: (1) Equal Opportunity Clause (41 CFR Part 60-1.4) under Executive Order 11246, as amended, and the regulations there under; (2) Affirmative Action Clause for Disabled Veterans of the Vietnam Era (41 CFR Part 60-250.5) under Section 402 of the Vietnam Era Veteran's Readjustment Assistance Act of



757.410.0233    600 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG.US.COM

1974, as amended, and the regulations there under; (3) Affirmative Action Clause for Handicapped Workers (41 CFR 60-741.5) under Section 503 of the Rehabilitation Act of 1973, as amended, and the regulations there under. The Seller also agrees to comply with the Fair Labor Standards Act and the Occupational Safety and Health Act, and all other applicable federal, state, county, and local laws, ordinances, regulations and codes (including the procurement of required permits and certificates and compliance with the Small and Minority Business Investment Act known as Public Law 95-507) in the Seller's performance hereunder. The Buyer encourages the Seller to provide opportunities and assistance to small, small disadvantaged, veteran owned and woman owned businesses in accessing the necessary channels to allow their maximum participation in the provision of goods and services. The Seller further agrees to indemnify and hold the Buyer and its customers harmless from any loss or damage that may be sustained by the Buyer, by reason of the Seller's failure to comply with any federal, state, county or local laws, ordinance, regulations and codes.

<u>Compliance with Environmental Laws:</u>  Seller shall identify material containing a hazardous material or substance including, but not limited to, those governed by the Resources Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.) and any similar acts and regulations promulgated pursuant to these acts. Each component, self-contained unit and carrier and shipping container shall be marked identifying the hazardous material by name. NOTIFICATION OF HAZARDOUS PRODUCT shall be sent to the Buyer's Purchasing Agent and shall specify the product name and part number, the nature of the hazard, proper precautions that must be undertaken by the Buyer or others and any additional information that the Buyer should reasonably expect to know to protect its interest.

**21.    GOVERNMENT CONTRACT PROVISIONS:**  If the Goods purchased hereunder are for use on a prime contract or subcontract of Buyer with the United States Government, the prevailing Defense Acquisition Regulations and Federal Procurement Regulations existing at the date of this order, which the government makes mandatory for inclusion in all Subcontracts/Purchase Orders hereunder, shall apply. When accepted, this order will constitute a subcontract under the prime contract awarded by the United States Government, and the requisite flowed-down clauses will be defined in the Order.

**22.    REPRODUCTION OF DOCUMENTATION:** Unless otherwise marked as "Proprietary…" by Seller, Buyer shall have the right at no additional charge, to use or incorporate all or portions of material found in the Seller's literature and/or reproduce the Seller's applicable literature such as operating and maintenance manuals, technical publications, prints, drawings, training manuals and other similar supporting documentation and sales literature. The Seller agrees to advise the Buyer of any updated information relative to the foregoing.

**23.    CANCELLATION AND TERMINATION:**  (a) Termination-Convenience – The performance of work under this order may be terminated in whole or in part, by Buyer of Buyer's convenience in accordance with the "Termination" clause in FAR 52.249-2 (as modified in 49.502(e)). In paragraph (c) of FAR 52.249-2, change 120 days to 45 days; in (e), change one year to six months. (b) Termination-Default – This order may be terminated in whole or in part by Buyer for default in accordance with the "Default" clause in FAR 52.249-8 (incorporated by reference). Except that the word "government" in all paragraphs other than (c) means Buyer. "Contractor" means Seller, and the references to a disputes clause shall mean Clause 25, "Disputes". Remedies granted under this clause shall be in addition to any other remedies which may be available to Buyer. If the parties fail to agree on the amount to be paid for manufacturing materials referred to in paragraph (d) of the "Default" clause, the amount shall be their reasonable value (not to exceed a reasonably allocable portion to the price of this order). The Buyer may cancel this Order in whole or in part at any time for cause by written, notice to the Seller, effective when sent, in the event that the Seller: (a) fails to comply with any term or condition of this Order including, but not limited to, delivery terms and warranty; or (b) appoints a receiver, liquidator or trustee in bankruptcy or other similar officer over any or all of its property or assets; or (c) files a voluntary petition in bankruptcy; or (d) has had filed against it an involuntary petition in bankruptcy which remains in effect for thirty (30) days; or (e) voluntarily ceases trading; or (f) merges with or is acquired by a third party; or (g) assigns any of its rights or obligations under the Order to a third party without the Buyer's advance written consent. Upon the occasion of any one of the aforesaid and in addition to any remedies which the Buyer may have in Law or in Equity, the Buyer may also cancel this Order or any outstanding deliveries hereunder by notifying the Seller in writing of such cancellation and the Seller shall thereupon transfer title and deliver to the Buyer such work in progress or completed Goods as may be requested by the Buyer. The Buyer shall have no liability to the Seller beyond payment of any balance owing for Goods purchased hereunder and delivered to and accepted by the Buyer prior to the Seller's receipt of the notice of termination, and for work in progress requested for delivery to the Buyer.

24.    **AUDIT:**  If Buyer deems an audit of Seller's books and records is needed to review cost or pricing data, compliance with price warranties, to price changes, termination, or otherwise, an audit may be conducted by Buyer, an independent party, or a Government Audit Agency.

25.    **DISPUTES:** Either party may litigate any disputes arising under or relating to this order before any court of competent jurisdiction or forum selected by Buyer. Pending resolution of any such dispute by settlement or by final judgment, Seller shall proceed diligently with performance.



757.410.0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG.US.COM

26.    **GOVERNING LAW AND VENUE:** The validity, performance, and construction of this order shall be governed by the laws of the Commonwealth of Virginia.  The Buyer and Seller waive personal service of any summons and complaint or other process in any action brought in said courts, and agree that service thereof may be made by registered mail, return receipt requested, directed to the other at the location specified on the face hereof.

27.    **SEVERABILITY:**  The provisions of this Agreement are separate and divisible, and if any court shall determine any provision of this Agreement is void and/or unenforceable, the remaining provision or provisions shall remain.



757.410.0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG.US.COM

**TMMG**
600 Independence Parkway, Suite 105
Chesapeake, VA 23320
Phone 757-410-1815 | Fax 757-410-7809
Attn: Amy D. Sanchez, Contracts Manager
Email: asanchez@tmmg.us.com

**MI-TECH, INC.**
6685 Jet Park Road
North Charleston, SC  29406
Phone: 843-553-2743 | Fax: 843-553-5541
Attn: Bobby Mimms
Email: bobbym@mi-tech.net

# Change Order 1

The following number must appear on all related correspondence, shipping papers, and invoices:
**P.O. NUMBER: TMMGMSC2017694**
**Task Order No: 2017-694**
**USS MOUNT WHITNEY TURBINE GENERATOR SUPPORT**

| P.O. DATE | REQUISITIONER | Period of Performance | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 01 Sept 2017 | Matt McKeon | 09/06/2017 to 09/17/2017 | Destination | See Section 2.0 of PO and Section 18 of attached Terms and Conditions |

| QTY | UNIT | DESCRIPTION | NOT TO EXCEED TOTAL |
|---|---|---|---|
| 1 | EA | **Change Order 1 is to add the following:**<br><br>1. PROCURE TWO (2) EACH PARALLEL SHAFT DRIVE UNITS, HUB CITY MODEL 22 STYLE A, AND COMPONENTS REQUIRED TO MODIFY DRIVE UNITS TO STYLE C.<br><br>2. PROCURE TWO (2) EACH MOUNTING KITS FOR SHAFT DRIVE UNITS.<br><br>3. DISASSEMBLE SHAFT DRIVE UNITS, AND REARRANGE OUTPUT SHAFTS TO CONFORM TO STYLE C SHAFT DRIVE UNIT.<br><br>4. PREPARE SHAFT DRIVE UNITS AND MOUNTING KITS FOR SHIPMENT TO USS MT. WHITNEY AT VIKTOR LENAC SHIPYARD.<br><br>All other terms and conditions remain unchanged. | $2,460.00 |

TMMG-PURCHASE ORDER



757.410.0233     600 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG.US.COM

| 1 | Job | RFP NO.: 532 USS MT WHITNEY REV 1 1C SSTG<br><br>STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR NINE (9) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 8 THRU SEPTEMBER 16, 2017 EXCLUDING TRAVEL TIME FOR FURTHER TESTING AND ADJUSTMENT OF THE NO. 1C SHIP'S SERVICE TURBINE GENERATOR.<br><br>A. LABOR<br>1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON<br>a. TRAVEL TIME FOR ONE (1) ROUND TRIP TO AND FROM RIJEKA, CROATIA DEPARTURE 9/6/2017 AND RETURN FROM ZAGREB, CROATIA 9/17/2017<br><br>16 ST HOURS @ $108.00/HOUR    $1,728.00<br>24 OT HOURS @ $162.00/HOUR    $3,888.00<br><br>b. ONBOARD/ON SITE SERVICES - NINE (9) DAYS 9/8/2017 THRU 9/16/2017<br>48 ST HOURS @ $108.00/HOUR    $5,184.00<br>60 OT HOURS @ $162.00/HOUR    $9,720.00<br>PRICE: $20,520.00<br><br>B. TRAVEL AND LIVING EXPENSES<br>1. AIRFARE    $11,024.16<br>2. MEALS $84.00/DAY X 13 DAYS    $1,092.00<br>3. COMMUNICATION    $403.00<br>PRICE: $12,519.16<br>TOTAL PRICE: $33,039.00<br><br>NOTES:<br>1. ANY ADDITIONAL COST INCURRED FOR TECHNICAL REPRESENTATIVE SERVICE AND/OR THE TRAVEL AND LIVING EXPENSES WILL BE SUBJECT TO AN ADDITIONAL PURCHASE ORDER.<br><br>2. THE ONBOARD/ON SITE QUOTED PRICE IS FOR TWELVE (12) HOURS PER DAY FOR THE NINE (9) DAYS ONBOARD/ON SITE WHETHER WORKING OR FOR STANDBY TIME WHILE WAITING FOR APPROVAL TO COMMENCE OR TO COMPLETE ANY WORK.<br><br>3. VIKTOR LENAC SHIPYARD WILL PROVIDE A SAFE AND RELIABLE VEHICLE OR RENTAL CAR TO BE DRIVEN BY THE MI-TECH TECHNICAL REPRESENTATIVE BE AVAILABLE AT THE AIRPORT IN ZAGREB FOR TRAVEL TO RIJEKA, LOCAL TRANSPORTATION AND THE TRAVEL BACK TO THE ZAGREB AIRPORT. THE CUSTOMER WILL BE RESPONSIBLE FOR ALL COST ASSOCIATED WITH THE CUSTOMER PROVIDED CAR I. E. GAS, ETC.<br><br>4. THE QUOTED PRICE FOR AIRFARE AND TRAVEL DATES ARE ONLY GOOD UNTIL 10:00 AM THURSDAY, AUGUST 31, 2017. AFTER THAT TIME THEY WILL HAVE TO BE REQUOTED AND THE DATES MAY NOT BE AVAILABLE.<br><br>5. TERMS: NET 30 | |

| | |
|---|---|
| SUBTOTAL | **$35,499.00** |
| SALES TAX | N/A |
| SHIPPING & HANDLING | N/A |
| OTHER | N/A |
| **NOT TO EXCEED TOTAL** | **$35,499.00** |

TMMG-PURCHASE ORDER



757 410 0233    600 Independence Parkway, Suite 105  Chesapeake, VA 23320    TMMG US COM

1. Seller must send 1 copy of their invoice, travel expense report and receipts to accountspayable@tmmg.us.com.

2. Seller shall invoice upon completion, submission of deliverable and acceptance by the Client. TMMG shall pay the Seller's invoices upon receipt of payment from Client or within forty-five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later. TMMG may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment.

3. This PO is in accordance with the Seller's quote number 178686 Rev 1 dated 08/30/2017 and quote 178684 dated 08/25/2017 (parts); delivery method, specifications listed in the Description and ATT A Terms and Conditions.

4. Travel and living expenses are authorized. Lodging and transportation will be provided by Client.

*BY ACKNOWLEDGING RECEIPT OF THIS ORDER (OR BY SHIPPING GOODS OR PERFORMING THE SERVICES CALLED FOR BY THIS ORDER), SELLER AGREES TO THE TERMS AND CONDITIONS CONTAINED HEREIN. IT IS AGREED THAT ANY SALES CONFIRMATION OR OTHER ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS CONTAINED IN ANY ACKNOWLEDGMENT OF THIS ORDER BY SELLER ARE WAIVED BY SELLER AND SHALL BE DEEMED OBJECTED TO BY BUYER WITHOUT NEED OF FURTHER NOTICE OF OBJECTION AND SHALL BE OF NO EFFECT OR UNDER ANY CIRCUMSTANCES BINDING UPON BUYER UNLESS ACCEPTED BY BUYER IN WRITING.*

| NAME AND TITLE OF SIGNER | | NAME AND TITLE OF SIGNER | |
| --- | --- | --- | --- |
| | | Arthur S. Mahony, COO | |
| AGREED TO FOR SELLER: | DATE: | AGREED TO FOR TMMG: | DATE: |
| | 9-7-17 | | 09/07/2017 |
| SIGNATURE OF PERSON AUTHORIZED TO SIGN | | SIGNATURE OF PERSON AUTHORIZED TO SIGN | |

TMMG-PURCHASE ORDER



757.410.0233    600 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG.US.COM

**TMMG**
600 Independence Parkway, Suite 105
Chesapeake, VA 23320
Phone 757-410-1815 | Fax 757-410-7809
Attn: Amy D. Sanchez, Contracts Manager
Email: asanchez@tmmg.us.com

**MI-TECH, INC.**
6685 Jet Park Road
North Charleston, SC  29406
Phone: 843-553-2743 | Fax: 843-553-5541
Attn: Bobby Mimms
Email: bobbym@mi-tech.net

# CHANGE ORDER 2

The following number must appear on all related correspondence, shipping papers, and invoices:

**P.O. NUMBER: TMMGMSC2017694**
**Task Order No: 2017-694**
**USS MOUNT WHITNEY TURBINE GENERATOR SUPPORT**

| P.O. DATE | REQUISITIONER | Period of Performance | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 01 Sept 2017 | Matt McKeon | 09/06/2017 to 09/22/2017 | Destination | See Section 2.0 of PO and Section 18 of attached Terms and Conditions |

| QTY | UNIT | DESCRIPTION | NOT TO EXCEED TOTAL |
|---|---|---|---|
| 1 | Job | CHANGE ORDER 2 is being issued to add the following:<br><br>NO. 1C SSTG<br>STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR AN ADDITIONAL FIVE (5) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 17 THRU 21 EXCLUDING TRAVEL TIME FOR FINAL ADJUSTMENT AND TESTING OF THE NO. 1C SSTG.<br><br>A. LABOR<br><br>1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON ONBOARD/ON SITE - ADDITIONAL FIVE (5) DAYS 9/17/17 THROUGH 9/21/17.<br>32 ST HOURS @ $108.00/HOUR          $3,456.00<br>28 OT HOURS @ $162.00/HOUR          $4,536.00<br>                              PRICE:  $7,992.00<br><br>NOTE: THE TECHNICAL REPRESENTATIVE WILL RETURN FROM ZAGREB, CROATIA ON 9/22/17.<br><br>B. TRAVEL AND LIVING EXPENSES<br><br>1. AIRFARE - FLIGHT CHANGE COST     $ 50.00<br>2. MEALS $84.00/DAY X 5 DAYS         $ 420.00<br>3. COMMUNICATION                     $155.00<br>                TOTAL PRICE:     $8,617.00<br><br>All other terms and conditions remain unchanged. | $8,617.00 |



757.410.0233    600 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG.US.COM

| 1 | Job | RFP NO.: 532 USS MT WHITNEY REV 1 1C SSTG<br><br>STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR NINE (9) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 8 THRU SEPTEMBER 16, 2017 EXCLUDING TRAVEL TIME FOR FURTHER TESTING AND ADJUSTMENT OF THE NO. 1C SHIP'S SERVICE TURBINE GENERATOR.<br><br>A. LABOR<br>1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON<br>a. TRAVEL TIME FOR ONE (1) ROUND TRIP TO AND FROM RIJEKA, CROATIA DEPARTURE 9/6/2017 AND RETURN FROM ZAGREB, CROATIA 9/17/2017<br><br>16 ST HOURS @ $108.00/HOUR     $1,728.00<br>24 OT HOURS @ $162.00/HOUR     $3,888.00<br><br>b. ONBOARD/ON SITE SERVICES - NINE (9) DAYS 9/8/2017 THRU 9/16/2017<br>48 ST HOURS @ $108.00/HOUR     $5,184.00<br>60 OT HOURS @ $162.00/HOUR     $9,720.00<br>           PRICE: $20,520.00<br><br>B. TRAVEL AND LIVING EXPENSES<br>1. AIRFARE     $11,024.16<br>2. MEALS $84.00/DAY X 13 DAYS     $1,092.00<br>3. COMMUNICATION     $403.00<br>           PRICE: $12,519.16<br>     TOTAL PRICE: **$33,039.00**<br><br><br>NOTES:<br>1. ANY ADDITIONAL COST INCURRED FOR TECHNICAL REPRESENTATIVE SERVICE AND/OR THE TRAVEL AND LIVING EXPENSES WILL BE SUBJECT TO AN ADDITIONAL PURCHASE ORDER.<br><br>2. THE ONBOARD/ON SITE QUOTED PRICE IS FOR TWELVE (12) HOURS PER DAY FOR THE NINE (9) DAYS ONBOARD/ON SITE WHETHER WORKING OR FOR STANDBY TIME WHILE WAITING FOR APPROVAL TO COMMENCE OR TO COMPLETE ANY WORK.<br><br>3. VIKTOR LENAC SHIPYARD WILL PROVIDE A SAFE AND RELIABLE VEHICLE OR RENTAL CAR TO BE DRIVEN BY THE MI-TECH TECHNICAL REPRESENTATIVE BE AVAILABLE AT THE AIRPORT IN ZAGREB FOR TRAVEL TO RIJEKA, LOCAL TRANSPORTATION AND THE TRAVEL BACK TO THE ZAGREB AIRPORT. THE CUSTOMER WILL BE RESPONSIBLE FOR ALL COST ASSOCIATED WITH THE CUSTOMER PROVIDED CAR I. E. GAS, ETC.<br><br>4. THE QUOTED PRICE FOR AIRFARE AND TRAVEL DATES ARE ONLY GOOD UNTIL 10:00 AM THURSDAY, AUGUST 31, 2017. AFTER THAT TIME THEY WILL HAVE TO BE REQUOTED AND THE DATES MAY NOT BE AVAILABLE.<br><br>5. TERMS: NET 30 |
|---|---|---|

|  |  |
|---|---|
| SUBTOTAL | $41,656.00 |
| SALES TAX | N/A |
| SHIPPING & HANDLING | N/A |
| OTHER | N/A |
| **NOT TO EXCEED TOTAL** | $41,656.00 |



757 410 0233   600 Independence Parkway Suite 105, Chesapeake, VA 23320   TMMG US COM

1. Seller must send 1 copy of their invoice, travel expense report and receipts to accountspayable@tmmg.us.com.

2. Seller shall invoice upon completion, submission of deliverable and acceptance by the Client. TMMG shall pay the Seller's invoices upon receipt of payment from Client or within forty-five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later. TMMG may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment.

3. This PO is in accordance with the Seller's quote number 178686 Rev 1 dated 08/30/2017 and 178686-1 dated 09/14/2017; delivery method, specifications listed in the Description and ATT A Terms and Conditions.

4 Travel and living expenses are authorized. Lodging and transportation will be provided by Client.

*BY ACKNOWLEDGING RECEIPT OF THIS ORDER (OR BY SHIPPING GOODS OR PERFORMING THE SERVICES CALLED FOR BY THIS ORDER), SELLER AGREES TO THE TERMS AND CONDITIONS CONTAINED HEREIN. IT IS AGREED THAT ANY SALES CONFIRMATION OR OTHER ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS CONTAINED IN ANY ACKNOWLEDGMENT OF THIS ORDER BY SELLER ARE WAIVED BY SELLER AND SHALL BE DEEMED OBJECTED TO BY BUYER WITHOUT NEED OF FURTHER NOTICE OF OBJECTION AND SHALL BE OF NO EFFECT OR UNDER ANY CIRCUMSTANCES BINDING UPON BUYER UNLESS ACCEPTED BY BUYER IN WRITING.*

| **NAME AND TITLE OF SIGNER** | | **NAME AND TITLE OF SIGNER** | |
| --- | --- | --- | --- |
| | | Arthur S. Mahony, COO | |
| AGREED TO FOR SELLER: | DATE: | AGREED TO FOR TMMG: | DATE: |
| | 9-14-17 | | 19 Sept 2017 |
| *SIGNATURE OF PERSON AUTHORIZED TO SIGN* | | *SIGNATURE OF PERSON AUTHORIZED TO SIGN* | |



757-410-1815    600 Independence Parkway, Suite 105, Chesapeake VA 23320    TMMG US COM

**TMMG**
600 Independence Parkway, Suite 105
Chesapeake, VA 23320
Phone 757-410-1815 | Fax 757-410-7809
Attn: Amy D. Sanchez, Contracts Manager
Email: asanchez@tmmg.us.com

**MI-TECH, INC.**
6685 Jet Park Road
North Charleston, SC  29406
Phone: 843-553-2743 | Fax: 843-553-5541
Attn: Bobby Mimms
Email: bobbym@mi-tech.net

# CHANGE ORDER 3

The following number must appear on all related correspondence, shipping papers, and invoices:
**P.O. NUMBER: TMMGMSC2017694**
**Task Order No: 2017-694**
**USS MOUNT WHITNEY TURBINE GENERATOR SUPPORT**

| P.O. DATE | REQUISITIONER | Period of Performance | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 01 Sept 2017 | Matt McKeon | 09/06/2017 to **09/27/2017** | Destination | See Section 2.0 of PO and Section 18 of attached Terms and Conditions |

| QTY | UNIT | DESCRIPTION | NOT TO EXCEED TOTAL |
|---|---|---|---|
| 1 | Job | Change Order 3 is being issued to add the following:<br><br>STATEMENT OF WORK<br>PROVIDE A MI-TECH, INC. TECHNICAL REPRESENTATIVE FOR AN ADDITIONAL SIX (6) DAYS ONBOARD/ON-SITE COMMENCING SEPTEMBER 22 THROUGH SEPTEMBER 27 EXCLUDING TRAVEL TIME FOR FINAL ADJUSTMENT AND TESTING OF NO. 1C SSTG<br><br>A.   LABOR<br>TECHNICAL REPRESENTATIVE SERVICE - ONE PERSON<br>ONBOARD/ON-SITE - ADDITIONAL SIX (6) DAYS 9/22/17 THROUGH 9/27/17<br>32 ST HOURS @ $108.00/HOUR          $3456.00<br>40 OT HOURS @ $162.00/HOUR          $6480.00<br>                    PRICE  $9935.00<br><br>NOTE  THE TECHNICAL REPRESENTATIVE WILL RETURN FROM ZAGREB, CROATIA ON 9/28/17<br><br>B.   TRAVEL AND LIVING EXPENSES<br>1   AIRFARE - FLIGHT CHANGE COST          $50.00<br>2   MEALS - $84.00/DAY X 6 DAYS          $504.00<br>3   COMMUNICATION          $186.00<br>                    TOTAL PRICE    $10,676.00<br><br>C. Parts<br><br>Flex Gaskets SWG-0800-0600-CG16G<br><br>All other Terms and Conditions remain unchanged | $10,676.00<br><br><br>$133.46 |

Page 1



| 1 | Job | CHANGE ORDER 2 is being issued to add the following:<br><br>NO. 1C SSTG<br>STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR AN ADDITIONAL FIVE (5) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 17 THRU 21 EXCLUDING TRAVEL TIME FOR FINAL ADJUSTMENT AND TESTING OF THE NO. 1C SSTG.<br><br>A. LABOR<br><br>1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON ONBOARD/ON SITE - ADDITIONAL FIVE (5) DAYS 9/17/17 THROUGH 9/21/17.<br>32 ST HOURS @ $108.00/HOUR          $3,456.00<br>28 OT HOURS @ $162.00/HOUR          $4,536.00<br>PRICE: $7,992.00<br><br>NOTE: THE TECHNICAL REPRESENTATIVE WILL RETURN FROM ZAGREB, CROATIA ON 9/22/17.<br><br>B. TRAVEL AND LIVING EXPENSES<br><br>1. AIRFARE - FLIGHT CHANGE COST    $50.00<br>2. MEALS $84.00/DAY X 5 DAYS        $420.00<br>3. COMMUNICATION                    $155.00<br>TOTAL PRICE:    $8,617.00<br><br>All other terms and conditions remain unchanged. | $8,617.00 |



RFP NO : 532 USS MT WHITNEY REV 1 1C SSTG

STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR NINE (9) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 8 THRU SEPTEMBER 16, 2017 EXCLUDING TRAVEL TIME FOR FURTHER TESTING AND ADJUSTMENT OF THE NO. 1C SHIP'S SERVICE TURBINE GENERATOR.

A. LABOR
1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON
a. TRAVEL TIME FOR ONE (1) ROUND TRIP TO AND FROM RIJEKA, CROATIA DEPARTURE 9/6/2017 AND RETURN FROM ZAGREB, CROATIA 9/17/2017

| | |
|---|---|
| 16 ST HOURS @ $108.00/HOUR | $1,728.00 |
| 24 OT HOURS @ $162.00/HOUR | $3,888.00 |

b. ONBOARD/ON SITE SERVICES - NINE (9) DAYS 9/8/2017 THRU 9/16/2017

| | |
|---|---|
| 48 ST HOURS @ $108.00/HOUR | $5,184.00 |
| 60 OT HOURS @ $162.00/HOUR | $9,720.00 |
| PRICE: | $20,520.00 |

B. TRAVEL AND LIVING EXPENSES

| | |
|---|---|
| 1. AIRFARE | $11,024.16 |
| 2. MEALS $84.00/DAY X 13 DAYS | $1,092.00 |
| 3. COMMUNICATION | $403.00 |
| PRICE: | $12,519.16 |
| TOTAL PRICE: | $33,039.00 |

NOTES:
1. ANY ADDITIONAL COST INCURRED FOR TECHNICAL REPRESENTATIVE SERVICE AND/OR THE TRAVEL AND LIVING EXPENSES WILL BE SUBJECT TO AN ADDITIONAL PURCHASE ORDER.

2. THE ONBOARD/ON SITE QUOTED PRICE IS FOR TWELVE (12) HOURS PER DAY FOR THE NINE (9) DAYS ONBOARD/ON SITE WHETHER WORKING OR FOR STANDBY TIME WHILE WAITING FOR APPROVAL TO COMMENCE OR TO COMPLETE ANY WORK.

3. VIKTOR LENAC SHIPYARD WILL PROVIDE A SAFE AND RELIABLE VEHICLE OR RENTAL CAR TO BE DRIVEN BY THE MI-TECH TECHNICAL REPRESENTATIVE BE AVAILABLE AT THE AIRPORT IN ZAGREB FOR TRAVEL TO RIJEKA, LOCAL TRANSPORTATION AND THE TRAVEL BACK TO THE ZAGREB AIRPORT. THE CUSTOMER WILL BE RESPONSIBLE FOR ALL COST ASSOCIATED WITH THE CUSTOMER PROVIDED CAR I. E. GAS, ETC.

4. THE QUOTED PRICE FOR AIRFARE AND TRAVEL DATES ARE ONLY GOOD UNTIL 10:00 AM THURSDAY, AUGUST 31, 2017. AFTER THAT TIME THEY WILL HAVE TO BE REQUOTED AND THE DATES MAY NOT BE AVAILABLE

5. TERMS: NET 30

Row: 1    Job

| | |
|---|---|
| SUBTOTAL | $52,465.46 |
| SALES TAX | N/A |
| SHIPPING & HANDLING | N/A |
| OTHER | N/A |
| NOT TO EXCEED TOTAL | $52,465.46 |

TMMG-PURCHASE ORDER



1. Seller must send 1 copy of their invoice, travel expense report and receipts to accountspayable@tmmg.us.com.

2. Seller shall invoice upon completion, submission of deliverable and acceptance by the Client. TMMG shall pay the Seller's invoices upon receipt of payment from Client or within forty-five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later. TMMG may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment.

3. This PO is in accordance with the Seller's quote number 178686 Rev 1 dated 08/30/2017, 178686-1 dated 09/14/2017, 179868-3 and 17868-4; delivery method, specifications listed in the Description and ATT A Terms and Conditions.

4. Travel and living expenses are authorized. Lodging and transportation will be provided by Client.

*BY ACKNOWLEDGING RECEIPT OF THIS ORDER (OR BY SHIPPING GOODS OR PERFORMING THE SERVICES CALLED FOR BY THIS ORDER), SELLER AGREES TO THE TERMS AND CONDITIONS CONTAINED HEREIN. IT IS AGREED THAT ANY SALES CONFIRMATION OR OTHER ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS CONTAINED IN ANY ACKNOWLEDGMENT OF THIS ORDER BY SELLER ARE WAIVED BY SELLER AND SHALL BE DEEMED OBJECTED TO BY BUYER WITHOUT NEED OF FURTHER NOTICE OF OBJECTION AND SHALL BE OF NO EFFECT OR UNDER ANY CIRCUMSTANCES BINDING UPON BUYER UNLESS ACCEPTED BY BUYER IN WRITING*

| NAME AND TITLE OF SIGNER | | NAME AND TITLE OF SIGNER | |
|---|---|---|---|
| | | Arthur S. Mahony, COO | |
| AGREED TO FOR SELLER: | DATE: | AGREED TO FOR TMMG: | DATE: |
| *SIGNATURE OF PERSON AUTHORIZED TO SIGN* | 10/2/17 | *SIGNATURE OF PERSON AUTHORIZED TO SIGN* | |

TMMG-PURCHASE ORDER

# EXHIBIT D

March 20, 2019

Chubb
PO BOX 5118
Scranton, PA 18505
USA

O    510-790-4676
F    800-336-0570
E    chan.saetern@chubb.com

Mr. Greg Horvath
The McHenry Management Group
600 Independence Pkwy., Suite 105
Chesapeake, Virginia 23320

CHUBB

**Re:**    **Edward Duvall (deceased) v The McHenry Management Group**
           **Our File No.: C440C879955X**
           **Date of Loss: 9/27/2017**
           **Policy: EIND38060387**

Dear Mr. Horvath:

We are writing to you as the authorized representative of The McHenry Management
Group. ACE American Insurance Company ("Chubb") was notified through The McHenry
Management Group's third party claims administrator, ESIS, Inc., of a claim under the
Defense Base Act (DBA) filed on behalf of Kimberly Duvall, widow of Edward Duvall. It is our
understanding that Mr. Duvall was an employee of subcontractor Mi-Tech, Inc. It is our
further understanding that they are altogether uninsured for DBA coverage. As such, Ms.
Duvall is seeking DBA coverage under The McHenry Management Group policy No.
ENID38060387 with effective dates 3/27/2017 to 3/27/2018 ("DBA Policy"), as a statutory
employer. We have assigned Robert Popich of Mouledoux, Bland, Legrand & Brackett and
will provide a defense on behalf of The McHenry Management Group, pending
investigation.

Please note that the DBA Policy issued to The McHenry Management Group for Part One
benefits only applies to those contracts or projects in the countries as delineated in the
Schedule set forth in the Defense Base Act Coverage Endorsement. See DBA Policy, General
Section; Information Page; End. No. 1. It is evident in reviewing the Policy that the operation
insured was for "SMART Inspections" conducted in countries of Philippines, Diego Garcia,
United Arab Emirates, and Croatia for Contract No. N00033-14-D-8005 (Dept of Navy). You
have advised that while The McHenry Management Group had DBA contract, the work
being performed by Mr. Duvall was outside of that contract and he was not acting as your
employee. If this is incorrect, please advise.

There may be additional DBA Policy provisions that apply to this matter. This letter
addresses only the provisions that appear pertinent at this time in light of the facts
presently known and available to us, without accepting or implying that the allegations have
any factual or legal merit. If there is any additional information that your Company believes
could affect Chubb's present coverage position, please forward such information to us at
your earliest convenience.

Chubb reserves all rights with regard to the above referenced provisions, as well as all other
rights, remedies and defenses under the DBA Policy, both in law and equity. Chubb further
reserves its right to amend this letter to address additional coverage issues that may arise

1

based upon the DBA Policy and/or any additional facts that may come to our attention. Nothing contained in this letter, and no action on our part should be construed as an admission of coverage or as a waiver of any rights, remedies, or defenses that may be available to Chubb.

If you have any questions or wish to discuss this matter, please feel free to contact us. Thank you.

Respectfully,

CHUBB

Chan Saetern
Chubb North American Claims


Cc: BB&T Insurance Services Inc./McGriff Insurance Services
    Lisa Hickman/ESIS

2

# EXHIBIT E

## Eric Gotwalt

| From: | Robert Popich <RPopich@mblb.com> |
|---|---|
| Sent: | Friday, August 02, 2019 4:48 PM |
| To: | Eric Gotwalt |
| Subject: | RE: Kimberly Duvall v. Mi-Tech, Zurich, The McHenry Management Group, and Chubb |
| Attachments: | McHenry Mgmt Group Redacted Contract.pdf |

Eric,

I am on a call now, but here is the policy. I am working on the other information. I will respond in full as soon as I can.

**From:** Eric Gotwalt <egotwalt@zlblaw.com>
**Sent:** Wednesday, July 31, 2019 4:54 PM
**To:** Robert Popich <RPopich@mblb.com>
**Subject:** Kimberly Duvall v. Mi-Tech, Zurich, The McHenry Management Group, and Chubb

Rob,

This email is sent in a good faith, final effort to avoid filing suit in district court to enforce a subpoena for your client's insurance policy.

We've never received your initial disclosures in this case.

It has been more than five months since we sent you a subpoena requesting the policy documents for McHenry Management Group's Chubb policy. I have asked repeatedly for the policy that was in effect on the date of my client's death (9.27.2017) and for the contract between the McHenry Management Group and whomever engaged them to do the work that was subbed out to Mi-Tech in Croatia. When we last spoke about a month ago, it was my understanding you would get me the policy. Since then:

I have left messages for you on at least a dozen occasions in the last 30 days.

I have sent texts to you with my cell number, imploring you to call any time.

I have sent emails to you, with no response, except through Patrick, on:

7/23
7/19
7/16
7/11
6/25
6/21
6/19
6/18
6/3

On July 17, Patrick sent me a copy of a renewal policy, but it did not take effect until after Mr. Duvall's death.

On Monday, I finally received a text from you indicating you would call me, but I never heard back from you.

It seems to me if there is a contractor above TMMG that might have DBA insurance, you'd want to provide that information to us. Likewise, if it is your contention that Chubb did not cover Mi-Tech's employees, this also would be information you'd want us to have. Likewise, if Chubb provided DBA coverage to TMMG but is going to claim that Mi-Tech's employees are not covered, TMMG will need to be notified of its potential liability, and its right to separate counsel.

Our firms have enjoyed a great relationship for many years. It is out of our respect for you and firm that we feel we've bent over backyards to provide you with time to get this information to us.

Please get in touch with me tonight or tomorrow. Thank you.

Eric R. Gotwalt
Zipperer, Lorberbaum & Beauvais
P.O. Box 9147
Savannah GA 31412
Ph. 912 232-3770
Fx. 912 232-0643
egotwalt@zlblaw.com


--
Get Fortress | Block | Allow | Report


-- --

2

# EXHIBIT F

## Eric Gotwalt

| From: | Eric Gotwalt |
|---|---|
| Sent: | Friday, November 15, 2019 3:13 PM |
| To: | Robert Popich |
| Cc: | Mark Eckels; Lara Sutherland |
| Subject: | FW: Duvall - Responses to Claimant's Request for Admissions |

| Tracking: | Recipient | Delivery |
|---|---|---|
| | Robert Popich | |
| | Mark Eckels | |
| | Lara Sutherland | Delivered: 11/15/2019 3:13 PM |

Dear Rob,

I did not receive a response to my email last Friday, which is re-printed below.

First, please provide answers to my interrogatories and responses to my request for production no later than Wednesday, November 20, 2019.

Second, in regard to your responses to my requests for admissions numbers 1, 2, 11, and 12, please withdraw your objections and either admit or deny these requests without qualification. There is nothing vague or ambiguous about requests, and there is no reason that they cannot be admitted or denied without qualification, e.g., "denied as written."

Third, in regard to your responses to my requests for admissions numbers 3 through 7, please withdraw your objection that no response is required from TMMG, and either admit or deny these requests without qualification.

Fourth, based on your responses to our request for admissions, I am going to need to take a 30(b)(6) deposition of TMMG. Topics will include each and every area included in our written discovery requests. I propose to take the deposition on one of the following dates. I provided possible deposition dates to you last Friday, but I did not receive a reply. Accordingly, I am noticing the 30(b)(6) deposition of TMMG for December 4, 2019, at TMMG's offices in Chesapeake, Virginia, at 11:00 a.m. Topics will include, among other subjects, each and every area included in our written discovery requests. A formal notice will be sent out on Monday.

Fifth, I am asking you, again, to consider whether TMMG may need to have separate conflict counsel because its interests and the carrier's interest appear to be at odds. If TMMG did not have DBA coverage for the work being done by Mr. Duvall, then the company and/or its officers may be liable for DBA benefits. I request that you consider this issue now so as not to delay trial.

Thank you.

Eric R. Gotwalt
Zipperer, Lorberbaum & Beauvais
P.O. Box 9147
Savannah GA 31412
Ph. 912 232-3770
Fx. 912 232-0643
egotwalt@zlblaw.com

-----Original Message-----
From: Eric Gotwalt
Sent: Tuesday, November 12, 2019 5:30 PM

1

To: Robert Popich <RPopich@mblb.com>
Cc: Mark Eckels <MEckels@boydjen.com>
Subject: RE: Duvall - Responses to Claimant's Request for Admissions

Rob,

Could you please update me as to whether you have served your responses to my interrogatories and requests for production?

Based on your responses to our request for admissions, I am going to need to take a 30(b)(6) deposition of TMMG. Topics will include each and every area included in our written discovery requests. I propose to take the deposition on one of the following dates. If I don't hear from you I will notice the deposition.

11/19
11/22
12/4
12/5
12/6
12/12
12/13

It appears that TMMG may need to have separate conflict counsel because its interests and the carriers interest appear to be at odds. If TMMG did not have DBA coverage for the work being done by Mr. Duvall, then the company and/or its officers may be liable for DBA benefits. I request that you consider this interest now so as not to delay trial.

Thank you.

Eric R. Gotwalt
Zipperer, Lorberbaum & Beauvais
P.O. Box 9147
Savannah GA 31412
Ph. 912 232-3770
Fx. 912 232-0643
egotwalt@zlblaw.com

-----Original Message-----
From: Eric Gotwalt
Sent: Friday, November 08, 2019 9:05 AM
To: Robert Popich <RPopich@mblb.com>
Subject: RE: Duvall - Responses to Claimant's Request for Admissions

We are closed Monday for Veterans Day because the parade blocks access to our office, but if you and Mark want to conference me in, just let me know what time works. Thanks.

Eric R. Gotwalt
Zipperer, Lorberbaum & Beauvais
P.O. Box 9147
Savannah GA 31412
Ph. 912 232-3770

Fx. 912 232-0643
egotwalt@zlblaw.com

-----Original Message-----
From: Robert Popich [mailto:RPopich@mblb.com]
Sent: Friday, November 08, 2019 9:02 AM
To: Eric Gotwalt <egotwalt@zlblaw.com>
Subject: RE: Duvall - Responses to Claimant's Request for Admissions

Eric,

My email was confusing below - I'm sorry. I'm out today for a school event for my son. I'm back in the office on Monday and anytime after 1pm CST works for me.

Rob

Robert N. Popich * Member
Mouledoux, Bland, Legrand & Brackett LLC P. 504-595-3000 * F. 504-522-2121 * C. 504-583-0298


-----Original Message-----
From: Eric Gotwalt <egotwalt@zlblaw.com>
Sent: Thursday, November 7, 2019 4:11 PM
To: Robert Popich <RPopich@mblb.com>
Subject: RE: Duvall - Responses to Claimant's Request for Admissions

Sure, I can call you tomorrow. What time works?

Eric R. Gotwalt
Zipperer, Lorberbaum & Beauvais
P.O. Box 9147
Savannah GA 31412
Ph. 912 232-3770
Fx. 912 232-0643
egotwalt@zlblaw.com

-----Original Message-----
From: Robert Popich [mailto:RPopich@mblb.com]
Sent: Thursday, November 07, 2019 5:09 PM
To: Eric Gotwalt <egotwalt@zlblaw.com>
Subject: Duvall - Responses to Claimant's Request for Admissions

Eric,

Attached are TMMG's Responses to RFAs. I wanted to get these out to you timely today, but complete responses coming to you Monday. I am out of the office tomorrow, but if you're free, want to get on a call and include Mark? We may need to move with depos etc.

Thx,

Rob

3

Robert N. Popich * Member
Mouledoux, Bland, Legrand & Brackett LLC P. 504-595-3000 * F. 504-522-2121 * C. 504-583-0298

-----Original Message-----
From: Joni Freibert <jfreibert@mblb.com>
Sent: Thursday, November 7, 2019 3:43 PM
To: Robert Popich <RPopich@mblb.com>
Subject: Duvall - Responses to Claimant's Request for Admissions

Thanks,
Joni Freibert * Legal Secretary
to Robert N. Popich, Patrick J. Babin and Pierce C. Azuma Mouledoux, Bland, Legrand & Brackett LLC
701 Poydras Street, Suite 4250 * New Orleans, LA 70139 P. 504-595-3000 * F. 504-522-2121 email * website

-----Original Message-----
From: Joni <jfreibert@mblb.com>
Sent: Thursday, November 7, 2019 3:37 PM
To: Joni Freibert <jfreibert@mblb.com>
Subject: Message from "ColorCopier"

This E-mail was sent from "ColorCopier" (MP C6003).

Scan Date: 11.07.2019 15:37:24 (-0600)
Queries to: savin@mblb.com

--
--

4

# EXHIBIT G

| | |
|---|---|
| **From:** | Robert Popich[RPopich@mblb.com] |
| **Sent:** | 14 January 2020 08:56:19 |
| **To:** | Hickman, Lisa M |
| **Cc:** | Lorino, David A |
| **Subject:** | [EXTERNAL] Duvall v. TMMG and Chubb - update |
| **Attachments:** | Letter 010720.pdf |

Lisa,

Following a telephone conference you and I had on 12/11, the corporate deposition of TMMG was set and taken on 11/20.   This explored what Deceased was doing at the time of injury and the relationship between the 3 defendants (Shipyard – MiTech – TMMG).   Following that depo, I immediately filed for a continuance of the FH, which was set for 1/23.   ALJ Price (formerly in Covington) is now the presiding ALJ on this claim in VA.    AS expected, he continued the case due to many reasons, but surprisingly, set an in-person Status Conference on that date (1/23) to discuss the outstanding issues and also offered to mediate the case.   One of the main issues I raised was Chubb DBA coverage to TMMG, which we knew was an issue.   However, following the corporate deposition and exploring the work that Deceased was doing at the time of his death, it is my opinion AND TMMG's opinion that the Chubb policy in question did NOT cover the work that Deceased was performing for Mi-Tech At the time of injury/death.   Thus, any liability that TMMG may have may be uninsured IF this is in fact a DBA claim.   Frankly, TMMG should not be in the claim either as its only role in this case was   a "middle man" to ensure that Mi-Tech was paid by the Croatian shipyard.

I will prepare a formal report on this as I just received the TMMG depo transcript, but in light of this, I defer to you as to when and how we report to Chan.    Regardless, I believe I have to attend the Status Conference and we'll also have to advise TMMG of this coverage issue at some point as they will need to secure counsel.

I welcome discussing this further with you.

Thanks,

Rob

Robert N. Popich • Member
Mouledoux, Bland, Legrand & Brackett LLC
P. 504-595-3000 • F. 504-522-2121 • C. 504-583-0298

# EXHIBIT 2

UNITED STATES DEPARTMENT OF LABOR

OFFICE OF ADMINISTRATIVE LAW JUDGES

KIMBERLY DUVALL
Survivor of EDWARD J. DUVALL,                    CASE NO:    2018-LDA-00591
               CLAIMANT

VERSUS                                            OWCP NO:  LS-06320344

MI-TECH, INCORPORATED,
               EMPLOYER

AND

THE MCHENRY MANAGEMENT GROUP, INC.
               EMPLOYER

AND

CHUBB INSURANCE COMPANY,
               CARRIER

---

## BRIEF OF THE MCHENRY MANAGEMENT GROUP, INC., ("TMMG"), AND CHUBB INSURANCE COMPANY/ACE AMERICAN INSURANCE COMPANY ("ACE/CHUBB")

**MAY IT PLEASE THE COURT:**

      This claim has been submitted to the Court on the Record.   All parties were afforded the opportunity to introduce Exhibits and accordingly, introduced Exhibits.    No formal hearing was conducted in this matter.    Following the original Decision and Order issued by Honorable Larry Price, Denying Benefits, dated April 26, 2021, the Decision and Order was appealed to the Benefits Review Board.    On March 15, 2022, the Benefits

Review Board, vacated the Decision and Order Denying Benefits and found that Defense Base Act Jurisdiction exists herein.

Kimberly Duvall ("Widow") claims entitlement to Defense Base Act benefits, as a result of her husband, Edward J. Duvall's ("Employee"), death while employed with his employer, Mi-Tech, Inc. ("Mi-Tech") in Croatia on September 27, 2017. Employee was assigned to work at a private shipyard, Viktor Lenac Shipyard ("VL Shipyard") to perform services aboard a vessel being serviced there. During his employment and in conjunction with a meeting he was involved in, he suffered a cardiac event and ultimately passed away. Responsible employer (and possibly, carrier) is disputed by the parties, as well as Widow's benefits' calculations should the claim be found compensable under the DBA. Thus, the key issues before this Court on remand are:

1. Responsible Employer/Carrier.

2. Average Weekly Wage Calculation.

3. Applicable Credit to Employer/Carrier.

**OVERVIEW**:

The incident giving rise to the subject claim occurred when Employee was employed as a field service supervisor working for his employer, Mi-Tech, in Croatia. (CX-11) The work he was performing at the time of his assignment was supervision and assistance to repairs being performed aboard a ship at the Croatian shipyard. On September 27, 2017, Employee suffered a suspected cardiac event and ultimately passed away from his injury/condition on the same day. (CX-5) Employee left behind his surviving spouse ("Widow") as the only beneficiary. (CX-6)

–2–

Widow seeks death benefits and funeral benefits under the DBA for Employee's death from either of the two employer-defendants herein.    Widow filed a South Carolina state workers' compensation claim (against Mi-Tech and its state carrier, Zurich Insurance Company) to protect her interests and rights therein and ultimately settled the claim, pending completing all the "steps" associated with South Carolina settlement approval process in addition to the subject DBA claim.    (TMMG EX-5)    Mi-Tech and TMMG have maintained that the state claim was her proper remedy and should this Court find a compensable DBA claim, the responsible party(s) are entitled to a credit under the LHWCA/DBA in the amount of the settlement reached (paid) in the South Carolina state compensation claim.

Complicating an already-complicated claim even further are insurance coverage issues under the DBA.    While Mi-Tech was insured for state compensation and LHWCA coverage (with Zurich Insurance Company on both jurisdictions), it was not insured for DBA coverage.    Likewise, the information and evidence discovered in the claim tends to reach the conclusion that TMMG was also uninsured for the specific incident at subject here, if DBA jurisdiction is found.

Notwithstanding the insurance-coverage and jurisdiction issues, legal and factual analysis of the claim's information and evidence results in a finding that Mi-Tech is the responsible employer herein.    Should this Court find a compensable claim, any benefits owed to Widow are the responsibility of Mi-Tech.

## I.    STIPULATED FACTS

The parties globally have not reached any Stipulations to enter before the Court.

–3–

However, Widow and Mi-Tech entered into Stipulations between themselves, which do not and cannot impact TMMG, as TMMG was not a party to the Stipulations.    (CX-46). In essence, the two parties stipulated to the underlying contract at issue, Employee's employment for Mi-Tech and the services to be provided under the alleged underlying contract between the private shipyard, VL Shipyard and Military Sealift Command. However, as more fully-argued and outlined below, there are no executed or authenticated documents to support the Stipulations, which is further supported by no exhibits or documents attached to the Stipulations.    Without same, the unsupported Stipulations are self-serving to the parties that entered into them.    Reviewing the Stipulations closely and the overwhelming evidence in the Record, will prove that the following facts are not disputed herein:

- Employee was a longtime employee of Mi-Tech and was employed by and working for Mi-Tech at the time of his incident and death.    The Employer/Employee relationship was between Employee and Mi-Tech for all purposes herein.

- The incident occurred at a private shipyard in Croatia.

- TMMG had no involvement in the work being performed aboard the USS Mount Whitney at VL Shipyard.

- TMMG was retained by Mi-Tech as a financial protection only to ensure Mi-Tech received payment from the foreign shipyard that it was not wholly familiar with.

## II.    ISSUES IN DISPUTE

- Responsible employer and/or carrier.

- Average weekly wage.

–4–

·    Whether Employee's cardiac injury and ultimate death were the result of his employment in Croatia; and

·    Whether a credit is owed to an Employer if found responsible herein.

## III.    FACTUAL BACKGROUND/ STATEMENT OF EVIDENCE

### A.    Summary of the Employee's Employment Information/Records/Testimony

As noted above and believed to be undisputed, Employee was an employee of Mi-Tech at all times pertinent hereto.    A review of Widow's and Mi-Tech's Stipulations confirms the Employer/Employee relationship (CX-46) as well as a review of Widow's deposition transcript, wherein she testified that Employee solely worked for Mi-Tech from 1990 or 1991 until his death.    (TMMG EX-4 p. 9, 27).    She testified as to his various international travels for work with Mi-Tech.    (Id.)    She further testified that Employee was contacted by Mi-Tech to perform work services for it in Croatia in September 2017, which was part of multiple trips he had to Croatia for Mi-Tech.    (TMMG EX-4 p.12-13) Widow testified that she had never heard of the company, TTMG.    (TMMG EX-4 p.16) She testified that Employee would perform large machinery repair on ships at shipyards and work at other locations.    (TMMG EX-4 p.16-17, 28)

Widow testified that Mi-Tech covered Employee's travel expenses when he travelled internationally for its work.    (TMMG EX-4 p.27)    Mi-Tech was the company that paid him, including for his work performed overseas, inclusive of the last Croatia trip. (TMMG EX-4 pp.27-28) Whether it was local work in South Carolina or international assignments, Employee received his assignments from Mi-Tech.    (TMMG EX-4 pp.29-30) Regardless of job location, Mi-Tech paid Employee his wages.    (Id.)    Widow

–5–

testified that she had not heard of TMMG prior to this claim, was not aware of Employee ever performing any services for TMMG and Employee never mentioned TMMG to her. (TMMG EX-4 p.33)    Widow testified that Employee's supervisor was the owner of Mi-Tech, Bill Totten, and he was the person who called her to notify her of Employee's death. (TMMG EX-4 p.38)    Employee had a 401-K plan with his employer, Mi-Tech.    (TMMG EX-4 pp.41-42)

As Widow admitted into the Record as an exhibit, Mi-Tech's website contains a photograph of Employee and his "biography" as part of its "Our Team" web-page.    (CX-10) The website excerpt confirms Employee's role with the company.    (Id.)    Further, Widow admitted into the Record evidence in the form of Forms W-2 and wages records further confirming that Employee was an employee of Mi-Tech and paid by Mi-Tech. (CX-12; CX-13).

**B.    Summary of the Work Being Performed by Employee**

It is undisputed that Employee was working for Mi-Tech in Croatia on a project at the privately-owned VL Shipyard.    The work to be performed was to take place aboard the ship, USS Mount Whitney.    The underlying contract for the work was purportedly entered into between Military Sealift Command and VL Shipyard.

**C.    Summary of TMMG's Involvement**

TMMG is a "white collar systems marine engineering" company that performs private sector work and government contract work.    (TMMG EX-2, p.3) TMMG's corporate representative, Shane Dowling, testified that TMMG does not perform any hands-on shipyard work.    (TMMG EX-2, p.3)    He clarified and explained that by

–6–

"white collar", they perform drawings and analysis on paper essentially.   (Id.)   While he testified that TMMG has had contracts directly with Military Sealift Command, the last one ended in 2016 and the next one started in 2018.   (Id.)   He confirmed that TMMG employees were not involved in the work-project in Croatia subject to this claim.   (TMMG EX-2 p.6) TMMG agreed to provide Mi-Tech with an "intermediary or broker" to ensure payment to them.   (Id.)   TMMG was a "pass-through" and the contract was between Viktor Lenac and Mi-Tech for the work.   (Id.)   TMMG confirmed that the only document between it and Viktor Lenac was the 3-page document Widow has identified as CX-33. (Id.)   Viktor Lenac had already agreed to the work services with Mi-Tech and TMMG came in only for financial assurance purposes.   (Id. at p.7)   TMMG never received the contract specifications from Viktor Lenac or Mi-Tech.   (Id.)   This was TMMG's only experience with Mi-Tech on these terms involving a foreign entity.   (Id.)

TMMG further supported its position and testified that the Purchase Orders between it and Mi-Tech were a "paper-trail"; Mi-Tech performs the work and deals directly with Viktor Lenac and TMMG ensures payment is received.   (Id. at p.8) TMMG never saw any specifications for the work Mi-Tech performed on the USS Mount Whitney in September 2017.   (Id. at 9).   TMMG confirmed it does no engineering work related to ships' turbine generators.   (Id.)

TMMG confirmed it did not know Employee, never met him and did not control his work performed.   (Id. at 14-15).

IV.    **TMMG Cannot Be Responsible as a Borrowing or Statutory Employer**

A.    **TMMG is Not a Borrowing Employer**

Pursuant to the controlling jurisprudence, TMMG cannot be found to be the borrowing employer.

At the time of his death, there is no dispute that Employee was an employee of Mi-Tech <u>for all purposes</u>.    Widow even filed her claim for benefits under the DBA (and South Carolina compensation laws) against his employer, Mi-Tech.    TMMG was then added later as a party to this claim after an insurance coverage arose.    (TMMG EX-1)

The seminal case applying the 'borrowed employee doctrine' under federal compensation law is <u>Ruiz v. Shell Oil Co.</u>, 413 F.2d 310, 312-13 (5th Cir. 1969).    <u>Ruiz</u> outlined nine factors to be evaluated in determining whether an employee is to be considered a borrowed employee of another.    The test was subsequently adopted and applied by the Benefits Review Board in <u>Vodanovich v. Fishing Vessel Owners Marine Ways</u>, Inc., 27 BRBS 286 (1994); <u>Pilipovich v. CPS Staff Leasing, Inc.</u>, 31 BRBS 169 (1997), with the following nine factors to consider/apply:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

When evaluating the Ruiz factors under the facts of this claim, it is clear that TMMG was not a borrowing employer.

First, all of the control of Employee was conducted by Mi-Tech. TMMG had no one on site, no one performing or supervising any of the work, nor giving directions remotely. The actual work being performed was Mi-Tech's work.

There was never an agreement, much less an understanding or meeting of the minds between Mi-Tech and TMMG that TMMG would become Employee's employer in any form of the word. In fact, TMMG did not know or know of Employee. This is supported by the absence of any agreement between the two defendants regarding who will perform the work and for whom. TMMG's corporate representative, Shane Dowling, confirmed that TMMG's role in this matter was simply a financial protection to Mi-Tech wherein it was retained by Mi-Tech to ensure Mi-Tech was paid for it its work by the shipyard. (TMMG EX-2) TMMG had zero involvement with the actual work being performed or with Employee.

There is also no evidence to support a finding that Mi-Tech terminated its relationship with Claimant. All of the evidence indicates otherwise. Claimant was a longstanding employee of Mi-Tech. Mi-Tech hasn't produced any evidence to dispute this.

–9–

With the lack of involvement in the work being performed, TMMG could not and did not furnish any tools to Employees.

Employee never crossed the threshold to become an employee of TMMG and thus, TMMG did not have the ability to discharge Employee.   Only his employer, Mi-Tech, was involved in the actual work being performed and could make a determination whether Employee could be discharged at any time.

Finally, it is undisputed that Mi-Tech had the obligation to pay Employee his wages. This is also confirmed by wage records from Mi-Tech and Widow's testimony. (CX-12; CX-13)   No evidence exists to the contrary.

Therefore, when applying the facts of this claim to the Ruiz factors, the complete evidence supports that TMMG cannot be found to be the Claimant's borrowing employer as not a single Ruiz factor applies to TMMG.

### B.    TMMG Cannot be Found Responsible as a Contractor/Subcontractor

Likewise, TMMG cannot be held responsible under a contractor/subcontractor liability theory, or Section 4 of the LHWCA.    Widow and/or Mi-Tech may seek to "climb the ladder" up the contractor rungs to a contractor that was insured for this loss. However, applying the facts of the claim herein, that argument must also fail.

First, TMMG was not a contractor to Mi-Tech in the legal sense of the word nor common interpretation.

Section 4(a) of the LHWCA provides:

> Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 7, 8, and 9. In the case of an employer who is a subcontractor, only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation. A subcontractor shall not be deemed to have failed to secure the payment of compensation if the contractor has provided insurance for such compensation for the benefit of the subcontractor. 33 U.S.C. § 904(a).

Thus, by express statutory mandate, an employer is liable for and shall secure the payment of compensation, medical benefits, and death benefits due to an injured employee. 33 U.S.C. § 932(a). See Insurance Co. of North America v. U.S. Dep't of Labor, 969 F.2d 1400, 1409, 26 BRBS 14 (CRT) (2d Cir. 1992), aff'g 25 BRBS 71 (1991), cert. denied, 507 U.S. 909 (1993).

Here, Employee was working for Mi-Tech, who failed to secure DBA insurance coverage and would be uninsured under DBA jurisdiction. However, Mi-Tech was insured for LHWCA and South Carolina state compensation coverage. Employee's Widow will allege that Mi-Tech was a subcontractor under Section 4(a) and the contractor should be liable for benefits under the "climbing up the ladder" theory. However, which company is the "contractor" for purposes under the DBA is disputed. TMMG was not the contractor and cannot be found to be the contractor to Mi-Tech. A review of the evidence as a whole proves that VL Shipyard was in fact, the contractor in this matter.

TMMG's role in this matter was extremely limited and behind-the-scenes. There is no evidence to dispute this. TMMG was simply a financial protection, a pass-through, to ensure that Mi-Tech was paid by the contractor (Viktor Lenac) for its work performed.

–11–

(TMMG EX-2)        This is undisputed.    In <u>Director, OWCP v. National Van Lines</u>, 613
F.2d 972, 11 BRBS 298 ( D.C. Cir. 1979), cert. denied , 448 U.S. 907 (1980), the court
held that:

> A general contractor will be held secondarily liable for workmen's
> compensation <u>when the injured employee was engaged in work either that
> is a subcontracted fraction of a larger project or that is normally conducted
> by the general contractor's own employees </u>rather than by independent
> contractor.

613 F.2d at 986-87, 11 BRBS at 316 (emphasis added). In <u>National Van Lines</u>, the
claimant was injured while performing duties which had been delegated to the claimant's
employer by National Van Lines, and which National Van Lines had itself been under a
contractual obligation to perform, the D.C. Circuit held National Van Lines secondarily
liable for benefits pursuant to Section 4(a).

Applying the <u>National Van Lines</u> rationale and holding to the claim at bar, places
Section 4 liability on VL Shipyard and not TMMG.   As more fully-discussed below,
TMMG was simply a financial protection to Mi-Tech and had no involvement with the work
to be performed.

In <u>Dailey v. Troth </u>, 20 BRBS 75 (1986), the Board, following the rationale of
<u>National Van Lines</u>, concluded that an investment partnership was not a contractor within
the meaning of Section 4(a) and thus not obligated to provide compensation insurance to
an injured employee employed by an uninsured construction company performing
carpentry work for the investment partnership. The Board found that the carpentry work
was neither a subcontracted fraction of a larger project or work normally conducted by
the partnership's employees.

–12–

Applying the rationale and holding of <u>Dailey</u> to the claim herein, also results in TMMG being found to not be a contractor or statutory employer.    Its involvement in this claim was strictly financial.

In <u>Sketoe v. Exxon Co., U.S.A.</u>, 188 F.3d 596, 33 BRBS 151 (CRT) (5th Cir. 1999), the United States Government executed an oil and gas lease of a tract off the Louisiana coast to Exxon. Exxon subsequently contracted with Dolphin Titan (DT) to drill on the tract. Sketoe was an employee of DT and, in the course and scope of his employment, he injured his hand. DT's compensation carrier paid benefits until it became insolvent. DT paid benefits until it also became insolvent about a year later. Sketoe then filed a claim against Exxon for payment of benefits, alleging that Section 4(a) required Exxon to cover for its subcontractor, DT.    The Fifth Circuit noted that *for liability to attach to Exxon for the compensation benefits, Exxon must have been the subject of the same contractual obligation that DT contracted with Exxon to perform*.    (Emphasis added)    This is the "two contract" requirement in which "a general employer will be held secondarily liable for workmen's compensation when the injured employee was engaged in work either that is a subcontracted fraction of a large project or that is normally conducted by the general employer's own employees rather than by independent contractual obligations." The court stated that the LHWCA distinguishes between employers who are owners and those who are general contractors working under contractual obligations to others. Only if there is a determination that Exxon delegated "the performance of portions of its contractual obligations" to DT is the Section 4(a) relationship formed thereby making Exxon statutorily liable for Sketoe's worker's comp benefits.

–13–

The Fifth Circuit then reasoned that because Sketoe was the employee of a drilling contractor, the determination depends upon the nature of the drilling obligation that Exxon owed to the Government. The court examined Louisiana mineral law to determine the obligations of Exxon. Accordingly, the Fifth Circuit concluded that Exxon is most appropriately considered as the owner of a real right, when it engaged the drilling services of DT, and was not a general contractor passing its own purely contractual obligation to its subcontractor, DT.

Similarly here, the contractor, VL Shipyard, delegated the performance of portions of its alleged obligations with Military Sealift Command to Mi-Tech.    Mi-Tech secured the work from VL Shipyard prior to any involvement of TMMG and had the delegated work performed by its employee.    TMMG was not involved in any of the performance of the work.    TMMG was only a financial protection for Mi-Tech.

When reviewing Section 4 of the LHWCA and the interpreting case-law, it must be concluded that TMMG was not and cannot be found to be a contractor to Mi-Tech, as to allow Widow to "climb the ladder" to coverage.    The proper contractor here is VL Shipyard and its subcontractor pursuant to the LHWCA and controlling jurisprudence was Mi-Tech.    Therefore, TMMG cannot be found liable under a statutory employer theory.

## V.    Average Weekly Wage

Section 10 of the Act sets forth three alternative methods for determining a claimant's average annual earnings, which are then divided by 52, pursuant to Section 10(d), to arrive at an average weekly wage.  33 U.S.C. § 910. Here, Section 10© is applicable.    Because Employee's employment was split between various overseas'

periods of employment for various durations as well as various stateside employment with Mi-Tech, the catch-all provision of Section 10(c) providing the ALJ with discretion should apply.    Sections 10(a) and 10(b) cannot reasonably and fairly be applied to yield an average weekly wage that reflects Employee's earning capacity at the time of his injury.    Section 10© has been applied where the claimant had various employment in the year prior to injury, including non-longshoring activities and self-employment. 33 U.S.C. § 910(c); *Hayes v. P & M Crane Co.*, 23 BRBS 389, 393 (1990).

Employee has solely worked for Mi-Tech since 1990/1991 and for applicable periods herein.    Wages records and Forms W-2 from Mi-Tech indicate that Employee earned a total of $308,150.10 from January 1, 2015 through September 27, 2017 (date of death).    (CX-12)    This 142.86-week period produces an average weekly wage of $2,106.91.

Due to the uncertain and indefinite nature, location, and durations of employment that Employee had with Mi-Tech, Section 10c should be applied by looking at the time period above, which represents an illustrative "window" of earnings that Employee had internationally and stateside with his employer.    This Court should find Claimant's average weekly wage to be $2,106.91.

## VI.    Entitlement to Credit

As noted above, due the jurisdiction dispute here, Widow also filed a South Carolina state workers' compensation claim (TMMG EX-5; CX-14), wherein it is believed a settlement was reached, pending completion of all the "steps"/requirements under South Carolina law.    It is undersigned counsel's understanding that the South Carolina

–15–

claim settled for $65,000.

Section 3(e) of the LHWCA provides:

Notwithstanding any other provision of law, any amounts paid to an employee for the same injury, disability, or death for which benefits are claimed under this Act pursuant to any other workers' compensation law or section 20 of the Act of March 4, 1915 (38 Stat. 1185, chapter 153; 46 U.S.C. 688) (relating to recovery for injury to or death of seamen) shall be credited against any liability imposed by this Act.

It is now well-established that the claimant can obtain concurrent state and Federal awards payable by the same employer for the same injury, so long as the employer receives a credit to avoid double payment to the claimant. See generally, <u>Sun Ship, Inc. v. Pennsylvania</u>, 447 U.S. 715, 12 BRBS 890 (1980); see also, <u>Landry v. Carlson Mooring Serv.</u>, 643 F.2d 1080, 13 BRBS 301 ( 5th Cir. 1981), rev'g 9 BRBS 518 (1978), cert . denied, 454 U.S. 1123 (1981). This proposition was codified in Section 3(e) of the LHWCA. 33 U.S.C.    903(e); see, <u>Vanover v. Foundation Constructors, Inc</u>., 22 BRBS 453 (1989), aff'd sub nom . <u>Foundation Constructors, Inc. v. Director, OWCP</u>, 950 F.2d 621, 25 BRBS 71 (CRT) ( 9th Cir. 1991).

The LHWCA and state compensation statutes are structured so that amounts received for a work-related injury under one system are credited against the amount obtained for the same injury under the other. <u>Munguia v. Chevron U.S.A., Inc.</u>, 23 BRBS 180, 182 (1990). <u>Cf . Bouchard v. General Dynamics Corp.</u>, 25 BRBS 152 (CRT) ( 2d Cir. 1992) (amount paid in settlement of a petitioner's claim under a state statute was credited against her prior award under the LHWCA on the ground that the LHWCA requires that state workers' compensation awards be credited against LHWCA awards; employer was self-insured under the LHWCA but had insurance coverage for state workers'

–16–

compensation claims.)

The amount of the credit shall be the actual dollar amount of the payment that was previously made to the claimant and not an amount based on the percentage of injury for which the claimant was previously compensated. Brown v. Bethlehem Steel Corp., 19 BRBS 200 (1987), on recon ., 20 BRBS 26 (1987), aff'd in pertinent part and rev'd on other grounds sub nom. Director, OWCP v. Bethlehem Steel Corp., 868 F.2d 759, 22 BRBS 47 (CRT).

Moreover, the employer is entitled to a credit for all payments made to the claimant, pursuant to a state act, for the same injury for which benefits are also sought under the LHWCA, regardless of the type of disability involved. Garcia v. National Steel & Shipbuilding Co., 21 BRBS 314, 317 (1988).

Since Widow's South Carolina claim sought benefits resulting from the same incident and ultimate death of Employee, should an employer herein be found responsible, that employer is entitled to a credit for the sum Widow received under the South Carolina workers' compensation settlement.

## VII.    TMMG Insurance Coverage Issue

TMMG's DBA insurance coverage with ACE/Chubb was limited to SMART Inspections and Contract Number 8005, which TMMG's corporate deposition confirmed was not subject to the Croatia incident with Employee.    (Id. at 15) (TMMG EX-3)    Thus, ACE/Chubb did not provide coverage for the work performed that led to Employee's cardiac incident and ultimate death subject to this claim.

–17–

## VIII.    Credibility of Evidence

It is well settled that the finder of fact is entitled to determine the credibility of witnesses and draw his or her own inferences from such evidence. *Bank v. Chicago Grain Trimmers Assoc., Inc.*, 390 U.S. 459, 467, *reh'g denied*, 391 U.S. 929 (1968); *Duhagon v. Metro. Stevedore Co.*, 31 BRBS 98, 101 (1997), *aff'd*, 169 F.3d 615 (9th Cir. 1999). An administrative law judge is not bound to believe the entirety of a witness's testimony, but may choose to believe only certain portions of the testimony, and may draw his or her own inferences and conclusions from the evidence.    *Altemose Constr. Co. V. Nat'l Labor Relations Bd.*, 514 F.2d 8, 16 n.5 (3d Cir. 1975).    The credibility of witnesses "involves more than demeanor" and includes an "over-all evaluation of the testimony in light of its rationality or internal consistency."    *Carbo v. U.S.*, 314 F.2d 718, 749 (9th Cir. 1963).    It is solely within the discretion of the ALJ to accept or reject all or any part of any testimony according to his or her judgment.    *Perini Corp. v. Heyde*, 306 F. Supp. 1321, 1327-1328 (D.R.I. 1969). *See also Poole v. National Steel & Shipbuilding Co.*, 11 BRBS 390 (1979). Findings of the ALJ should be supported by substantial evidence in the record considered as a whole, and will be upheld so long as they are rational, and in accordance with law.

Here, Widow and TMMG's corporate representative provided credible, well-reasoned and supported testimony regarding Employee's employment and the work subject to this claim.    (TMMG EX-2; TMMG EX-5) Their testimony is factually-supporting of the defenses and arguments asserted above and supported by the Record as a whole. The Court should afford greater weight to Widow's and TMMG's testimony than to unsigned documents or unsupported Stipulations that did not include a necessary party

within it.

## IX.    CONCLUSION

The overwhelming factual evidence and legal analysis of same supports a finding

that TMMG is not and cannot be found responsible for this claim.

Respectfully submitted,

ROBERT N. POPICH        (29386)
MOULEDOUX, BLAND, LEGRAND
    & BRACKETT, LLC
701 Poydras Street, Suite 600
New Orleans, LA    70139
Telephone:   504.595.3000
Facsimile:    504.522.2121
rpopich@mblb.com
Attorneys for The McHenry Management Group and
Chubb Insurance Co.
H:\0820\2019 Files\19124 Duvall\Pleadings\Post Trial Brief_TMMG_2022.docx

–19–

# **EXHIBIT 3**

**IN THE UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | | |
|---|---|---|
| KIMBERLY DUVALL, Claimant, | ) | |
| Widow of EDWARD DUVALL, | ) | |
| | ) | |
|     Employee, | ) | |
| | ) | Case #:    2018-LDA-00591 |
| v. | ) | OWCP No:  06-320344 |
| | ) | |
| MI-TECH, INC. and ZURICH AMERICAN | ) | |
| INSURANCE, | ) | |
| | ) | |
|     Employer/Carrier. | ) | |

**EMPLOYEE'S MOTION TO ADD PARTY**

COMES NOW, KIMBERLY DUVALL, Claimant in the above matter, and files this her motion to add as a party The McHenry Management Group, Inc. [TMMG], and shows the following:

This is a widow's claim for death benefits under Section 9 of the LHWCA.  Upon information and belief, at the time of his death, on September 27, 2017, the decedent, Edward Duvall, was engaged in the repair of a United States Navy ship, the USS Whitney, at a shipyard in Croatia, in furtherance of a contract between TMMG and the United States Department of Defense for work that meets the coverage requirements of Section 1(a) of the Defense Base Act. TMMG subcontracted with the decedent's employer, Mi-Tech, for some of the work, via a purchase order, attached as Exhibit 1, whereupon Mi-Tech deployed the decedent to Croatia.

In response to Claimant's interrogatories, Zurich American has stated that Zurich did not provide Defense Base Act coverage for Mi-Tech's employees on or at any time after September 27, 2017.  Mi-Tech's counsel has represented that Mi-Tech had no DBA coverage under any other policy of insurance.

Section 1(a) of the Defense Base Act adopts the provisions of the Longshore and Harbor Workers' Compensation Act [LHWCA] in regard to the injury or death of employees engaged in employment of certain contracts with agencies of the United States government that are to be performed overseas.

Section 4(a) of the LHWCA provides that an employer shall be liable for the payment of compensation, medical benefits, and death benefits due an injured employee and, therefore, must secure payment of these benefits by becoming insured or by qualifying as a self-insurer.

Section 5(a) of the LHWCA provides,

> The liability of an employer prescribed in section 4 [33 USC § 904] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this Act, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the Act, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee. For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 4 [33 USC § 904].

It has become apparent, through discovery, that Mi-Tech did not secure DBA coverage for its employees; therefore, TMMG and its insurer, who is unknown, may be liable to the Claimant for any death benefits that are awarded to her. Claimant respectfully requests that TMMG be added as parties in order to avoid piecemeal litigation and ensure that all potentially liable parties are before the Court. Upon information and belief, TMMG may be served at 600 Independence Parkway, Suite 105, Chesapeake, VA 23320. A show cause order is attached as Exhibit 2 for the Court's consideration.

2

This 2ⁿᵈ day of January, 2019.

ZIPPERER, LORBERBAUM & BEAUVAIS
Attorneys for the Employee

By: _____
Eric R. Gotwalt
Georgia Bar No. 303180

P.O. Box 9147
Savannah, GA  31412
Ph. (912) 232-3770
Fx. (912) 232-0643
egotwalt@zlblaw.com



757 410.0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG US .com

## PURCHASE ORDER

**TMMG**
600 Independence Parkway, Suite 105
Chesapeake, VA 23320
Phone 757-410-1815 | Fax 757-410-7809
Attn: Amy D. Sanchez, Contracts Manager
Email: asanchez@tmmg.us.com

**MI-TECH, INC.**
6685 Jet Park Road
North Charleston, SC  29406
Phone: 843-553-2743 | Fax: 843-553-5541
Attn: Bobby Mimms
Email: bobbym@mi-tech.net

The following number must appear on all related correspondence, shipping papers, and invoices:
**P.O. NUMBER: TMMGMSC2017694**
**Task Order No: 2017-694**
**USS MOUNT WHITNEY TURBINE GENERATOR SUPPORT**

| P.O. DATE | REQUISITIONER | Period of Performance | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 01 Sept 2017 | Matt McKeon | 09/06/2017 to 09/17/2017 | Destination | See Section 2.0 of PO and Section 18 of attached Terms and Conditions |

| QTY | UNIT | DESCRIPTION | | NOT TO EXCEED TOTAL |
|---|---|---|---|---|

TMMG-PURCHASE ORDER

Exhibit 1



757 410 0233     600 Independence Parkway, Suite 105, Chesepeake, VA 23320     TMMG.NET.COM

| | | |
|---|---|---|
| 1 | Job | RFP NO.: 532 USS MT WHITNEY REV 1 1C SSTG<br><br>STATEMENT OF WORK: PROVIDE A MI-TECH TECHNICAL REPRESENTATIVE FOR NINE (9) DAYS ONBOARD/ON SITE COMMENCING SEPTEMBER 8 THRU SEPTEMBER 16, 2017 EXCLUDING TRAVEL TIME FOR FURTHER TESTING AND ADJUSTMENT OF THE NO. 1C SHIP'S SERVICE TURBINE GENERATOR.<br><br>A. LABOR<br>1. TECHNICAL REPRESENTATIVE SERVICE - ONE (1) PERSON<br>a. TRAVEL TIME FOR ONE (1) ROUND TRIP TO AND FROM RIJEKA, CROATIA DEPARTURE 9/6/2017 AND RETURN FROM ZAGREB, CROATIA 9/17/2017<br><br>16 ST HOURS @ $108.00/HOUR    $1,728.00<br>24 OT HOURS @ $162.00/HOUR    $3,888.00<br><br>b. ONBOARD/ON SITE SERVICES - NINE (9) DAYS 9/8/2017 THRU 9/16/2017<br>48 ST HOURS @ $108.00/HOUR    $5,184.00<br>60 OT HOURS @ $162.00/HOUR    $9,720.00<br>                  PRICE:  $20,520.00<br><br>B. TRAVEL AND LIVING EXPENSES<br>1. AIRFARE    $11,024.16<br>2. MEALS $84.00/DAY X 13 DAYS    $1,092.00<br>3. COMMUNICATION    $403.00<br>                PRICE:  $12,519.16<br>    TOTAL PRICE:  $33,039.00<br><br>NOTES:<br>1. ANY ADDITIONAL COST INCURRED FOR TECHNICAL REPRESENTATIVE SERVICE AND/OR THE TRAVEL AND LIVING EXPENSES WILL BE SUBJECT TO AN ADDITIONAL PURCHASE ORDER.<br><br>2. THE ONBOARD/ON SITE QUOTED PRICE IS FOR TWELVE (12) HOURS PER DAY FOR THE NINE (9) DAYS ONBOARD/ON SITE WHETHER WORKING OR FOR STANDBY TIME WHILE WAITING FOR APPROVAL TO COMMENCE OR TO COMPLETE ANY WORK.<br><br>3. VIKTOR LENAC SHIPYARD WILL PROVIDE A SAFE AND RELIABLE VEHICLE OR RENTAL CAR TO BE DRIVEN BY THE MI-TECH TECHNICAL REPRESENTATIVE BE AVAILABLE AT THE AIRPORT IN ZAGREB FOR TRAVEL TO RIJEKA, LOCAL TRANSPORTATION AND THE TRAVEL BACK TO THE ZAGREB AIRPORT  THE CUSTOMER WILL BE RESPONSIBLE FOR ALL COST ASSOCIATED WITH THE CUSTOMER PROVIDED CAR I. E. GAS, ETC.<br><br>4. THE QUOTED PRICE FOR AIRFARE AND TRAVEL DATES ARE ONLY GOOD UNTIL 10:00 AM THURSDAY, AUGUST 31, 2017.  AFTER THAT TIME THEY WILL HAVE TO BE REQUOTED AND THE DATES MAY NOT BE AVAILABLE.<br><br>5. TERMS: NET 30 |

| | |
|---|---|
| SUBTOTAL | **$33,039.00** |
| SALES TAX | N/A |
| SHIPPING & HANDLING | N/A |
| OTHER | N/A |
| **NOT TO EXCEED TOTAL** | **$33,039.00** |

TMMG-PURCHASE ORDER

 757 410 0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG.US.COM

1  Seller must send 1 copy of their invoice, travel expense report and receipts to accountspayable@tmmg.us.com.

2  Seller shall invoice upon completion, submission of deliverable and acceptance by the Client. TMMG shall pay the Seller's invoices upon receipt of payment from Client or within forty-five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later. TMMG may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment.

3  This PO is in accordance with the Seller's quote number 178686 Rev 1 dated 08/30/2017; delivery method, specifications listed in the Description and ATT A Terms and Conditions.

4  Travel and living expenses are authorized. Lodging and transportation will be provided by Client.

*BY ACKNOWLEDGING RECEIPT OF THIS ORDER (OR BY SHIPPING GOODS OR PERFORMING THE SERVICES CALLED FOR BY THIS ORDER), SELLER AGREES TO THE TERMS AND CONDITIONS CONTAINED HEREIN. IT IS AGREED THAT ANY SALES CONFIRMATION OR OTHER ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS CONTAINED IN ANY ACKNOWLEDGMENT OF THIS ORDER BY SELLER ARE WAIVED BY SELLER AND SHALL BE DEEMED OBJECTED TO BY BUYER WITHOUT NEED OF FURTHER NOTICE OF OBJECTION AND SHALL BE OF NO EFFECT OR UNDER ANY CIRCUMSTANCES BINDING UPON BUYER UNLESS ACCEPTED BY BUYER IN WRITING.*

| NAME AND TITLE OF SIGNER | | NAME AND TITLE OF SIGNER | |
|---|---|---|---|
| | | Arthur S. Mahony, COO | |
| AGREED TO FOR SELLER: | DATE: | AGREED TO FOR TMMG: | DATE: |
| | | | 09/01/2017 |
| *SIGNATURE OF PERSON AUTHORIZED TO SIGN* | | *SIGNATURE OF PERSON AUTHORIZED TO SIGN* | |

TMMG-PURCHASE ORDER



757 410 0233    600 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG.net

**TMMG**
**PURCHASE ORDER GENERAL TERMS AND CONDITIONS**

By accepting this Standard Form of Purchase Order (hereinafter referred to as "the Order") the Seller accepts the Terms and Conditions included herein, unless the Seller notifies The McHenry Management Group, Inc. (TMMG) (hereinafter referred to as "the Buyer") of the Seller's objections.

1.    **ACKNOWLEDGMENT AND ACCEPTANCE OF ORDER:** This Order constitutes an offer from the Buyer that is expressly limited to the Terms and Conditions contained herein. The Terms and Conditions of this Order are those that apply to the purchase of materials, items, products, services, or components (hereinafter referred to as "Goods"). All exhibits, attachments, technical specifications, drawings, notes, instructions, or information referenced in the Order are incorporated herein by reference. Acceptance of this Order by Seller shall be evidenced by Seller's signing and returning as acknowledgement copy of the Order, commencement of performance, or the timely delivery of the goods in accordance with the terms of this Order as herein specified. Commencement of performance includes any act by Seller evidencing intent to supply the Goods ordered. This Order constitutes the entire agreement between the Seller and the buyer and may be changed or modified only by a written Change Order signed by Buyer's authorized representative.

2.    **CHANGES:** The Buyer shall have the right at any time, by written notice, in the form of a Change Order, to the Seller, to make any changes it deems necessary, including, but not limited to, changes in specifications, design, delivery, testing methods, packing or destination. If any such required changes cause an increase or decrease in the cost of or the time required for performance, an equitable adjustment shall be made in the contract price or delivery schedule, or both. Any claim by the Seller for adjustment under this clause shall be deemed waived unless asserted in writing within ten (10) days from receipt by the Seller of notice of change. Price increases, extensions of time for delivery and change in quantity shall not be binding on the Buyer unless evidenced by a form of Change Order issued and signed by the Buyer.

3.    **DELIVERY/FORCE MAJEURE:** Delivery shall be strictly in accordance with the Buyer's delivery schedule. If Seller's deliveries fail to meet such schedule, Buyer, without limiting its other remedies, may direct expedited routing. The difference between the expedited routing and the Order routing costs shall be paid by Seller. Furthermore, if Goods are not delivered by the date specified herein, the Buyer reserves the right, without liability, to cancel this Order as to any Goods not yet shipped or tendered, and to purchase substitute Goods and to charge the Seller for any loss incurred. Cancellation notices made by the Buyer to the Seller, shall be made in writing. Any provisions hereof for delivery by installment shall not be construed as making the obligations of the Seller severable. The Buyer shall have the right to refuse deliveries made more than one week in advance of any delivery schedule appearing in this Order unless arrangements for such early delivery have been confirmed with the receiving party. The Seller shall notify the Buyer in writing promptly of any delays (however caused) and of any actual potential labor dispute which delays or threatens to delay the timely performance of this Order. If the Seller is unable to complete performance at the time specified for delivery hereunder, by reason of strikes, labor disputes, riot, war, fire, or natural disasters beyond the Seller's reasonable control, the Buyer, at its option, may elect to take delivery of Goods hereunder in its unfinished state and to pay such proportion of the contract price as the work then completed bears to the total work hereunder and to cancel this Order without liability as to the balance of the Goods covered hereunder.

4.    **TITLE AND RISK OF LOSS:** Title to any property furnished by Buyer on other than a charge basis shall, at all times, remain in Buyer's name. Seller assumes the risk of loss or damage. Seller agrees to procure insurance satisfactory to Buyer, insuring the full insurable value of all Buyers' property in Seller's possession against loss or damage. Satisfactory evidence of such insurance shall be submitted to Buyer when requested. Seller shall pay all taxes assessed against Buyer's property or its use while in Seller's possession and also file all necessary declarations and reports. Risk of Loss shall transfer to Buyer upon Buyer's Formal Acceptance of Buyer's Property.

5.    **TAXES:** Seller agrees that the prices set forth in this Order include all applicable federal, state, and local taxes, including but not limited to applicable sales, use, excise, value-added, and/or similar taxes. Seller agrees to accept and use tax exemption certificates supplied by Buyer only if they are acceptable to the taxing authorities. If any tax included in these prices was not required to be paid by Seller, Seller shall notify Buyer promptly and diligently pursue a refund to Buyer.

6.    **WARRANTY:** Seller warrants that Goods delivered, the packaging, labeling and sorting thereof, any installation, repair, and maintenance of Goods, and any other performance pursuant to this Order will be (a) free of infringements on property rights of third parties, including without limitation, any patent, trademark, trade name, copyright or right of publicity; (b) free from defects in material and workmanship; (c) of merchantable quality; (d) fit for the intended use of Buyer, Buyer's customers and any other intended uses of such Goods; (e) of a grade and performance in conformity with all specifications, blueprints, designs, drawings, samples, models, descriptions, instructions and other items referred to in this Order. Seller warrants that any services to be performed by Seller hereunder will be performed by Seller, as an independent contractor, in a good and workmanlike manner. In addition to any other constructive, express or implied warranties, the Seller warrants that if Goods covered by this Order are found not to be as warranted, the Buyer may,



757-410 0233    600 Independence Parkway  Suite 105  Chesepeake, VA 23320    TMMG IPS.COM

by written notice to the Seller: (a) rescind this Order as to such non-conforming Goods, (b) accept such Goods at an equitable reduction in price, (c) reject such non-conforming Goods and require the delivery of suitable replacements. If the Seller fails to deliver suitable replacements promptly, the Buyer, with notice of five business days, may replace or correct such Goods and charge the Seller the additional cost occasioned the Buyer thereby, or terminate this Order for default. Cost of replacement, rework, inspection, repackaging and transportation of such corrected Goods shall be at the Seller's expense.

This warranty provision shall survive any inspection, delivery, acceptance, payment, expiration or earlier termination of this Order and such warranties shall run to the Buyer, its successors, assigns, employees, customers, and end users of the Goods. Nothing herein, however, shall limit the Buyer's rights in law or equity for damages resulting from delivery of defective goods or damage caused during the delivery of goods or provision of services. Rights, granted to the Buyer in this article entitled WARRANTY, are in addition to any other rights or remedies provided elsewhere in this Order or in Law.

7.      **PRICE WARRANTY:** Seller warrants that the price of the ordered items does not exceed the price charges by the Seller to any other customer purchasing the same items in like or similar quantities and under similar conditions of purchase.

8.      **INSPECTION AND ACCEPTANCE:** The Seller shall inspect all Goods prior to shipment to the Buyer. All Goods covered by this Order may be inspected and tested by the Buyer or its designee. If the Buyer elects, in writing, to inspect or test, successful completion of such inspection and testing shall be a prerequisite to the Buyer's acceptance of the Goods. If deemed necessary by the Buyer, the Seller shall provide without charge, all reasonable facilities and assistance for such inspection and test. Any inspection records relating to the Goods covered by this Order shall be available to the Buyer during the performance of this Order and for such longer periods as specified by the Buyer. If any Goods covered by this Order is defective or otherwise not conforming to the requirements of this Order, the Buyer may, by written notice to the Seller: (a) rescind this Order as to such non-conforming Goods, (b) accept Goods at an equitable reduction in price, (c) reject such non-conforming Goods and require the delivery of suitable replacements. If the Seller fails to deliver suitable replacements promptly, the Buyer, with advance notice of five (5) business days, may replace or correct such Goods and charge the Seller the additional cost occasioned the Buyer thereby, or terminate this Order for default.  No inspection (including source inspection) test, approval (including design approval) or acceptance of Goods shall relieve the Seller from responsibility for defects or other failures to meet the requirements of this Order. Rights granted to the Buyer in this article are in addition to any other rights or remedies provided elsewhere in this Order or in Law.

9.      **BUYER'S PROPERTY IN SELLER'S POSSESSION:** All Materials, documents, software, graphic images, hardware, art, data (regardless of use), tools, special dies, molds, patterns, jigs and any other property furnished to the Seller by the Buyer or specifically paid for by the Buyer for use in the performance of this Order shall be, and shall remain the property of the Buyer; shall be subject to removal at any time upon the Buyer's demand; shall be used only in filling orders for the Buyer; shall be maintained in good order and condition and shall be clearly identified as the property of the Buyer. The Seller will permit (with reasonable accommodations, the Buyer or their designated agent full and unfettered access to the Sellers location, place of business or plant facilities for the purpose of inspecting and verifying Buyer's Property in the Sellers possession and to ensure that the Terms and Conditions incorporated herein are being adhered to. When necessary, the Buyer agrees to complete the Sellers Non-Disclosure Agreement (NDA) or Proprietary Information Exchange Agreement (PIEA) prior to requesting access. The Seller assumes all liability for loss or damage to the Buyers property. In the event data integrity has been breached or is suspected of having been compromised by anyone in any way, the Seller shall immediately notify Buyer.  Notification of a breach or suspected compromise does not indemnify the Seller in any way.

10.     **PATENT INDEMNITY:** The Seller agrees to indemnify, hold harmless and defend the Buyer, its employees, directors, officers, agents and customers with respect to all claims, suits, actions and proceedings of actual or alleged infringements of any Letter, Patent, Registered or Industrial Design, Trademark or Trade Name, Trade Secret, Copyright or other protected right in any country resulting from any sale, use or manufacture of any Goods delivered hereunder and to pay and discharge all judgments, decrees, and awards rendered therein or by reason thereof and bear all expenses and legal fees (including the Buyer's) associated herewith. The Buyer reserves the right to be represented in any such action by its own counsel at its own expense.

11.     **INDEMNITY:** The Seller will indemnify, defend and hold the Buyer, its directors, officers, employees, agents, subcontractors, and customers harmless from any loss, expense, claim or damage including reasonable defense costs, arising from any claim or action based on any acts or omissions of the Seller, its employees, servants, agents or subcontractors. The Buyer reserves the right to be represented in any such action by its own counsel at its own expense.

12.     **ASSIGNMENT/SUBCONTRACTING:**  The Seller shall not assign this Order, any rights under this Order, or any monies due or to become due hereunder, nor delegate or subcontract any obligations or work hereunder, without the prior written consent of the Buyer. No purported assignment or delegation by the Seller shall be binding on the Buyer without such advance written consent.



P:/ 410.0233    600 Independence Parkway  Suite 105  Chesepeake, VA 23320

13.    **WAIVER:** Failure of the Buyer to insist, in any instance, upon the strict performance of any provision of this Order, or to exercise any right or privilege granted to the Buyer hereunder, shall not constitute or be construed as a waiver of any such provision or right and the same shall continue in force.

14.    **PROPRIETARY INFORMATION/TITLE TO SPECIFICATIONS** All written information obtained by the Seller from the Buyer in connection with this Order and which is identified as proprietary, including, but not limited to, any specifications, art, graphic images, data (in any form), drawings, blueprints, and software programs, shall remain the property of the Buyer, shall be used by the Seller only to the extent necessary for performance of this Order, and shall not be disclosed to any third parties without prior written consent of the Buyer. The Seller shall not make or authorize any news release, advertisement, or other disclosure which shall deny or confirm the existence of this Order without prior written consent of the Buyer except as may be required to perform this Order.

15.    **SHIPPING, PACKAGING AND LABELING:** Shipping Terms shall be F.O.B. destination to Buyer's delivery location unless otherwise noted within the terms of this Order. All Goods purchased hereunder must be packed and packaged to ensure its safe delivery in accordance with good commercial practice and where incorporated, the Buyer's packaging specification. The Seller shall mark on all containers, handling and loading instructions, shipping information, part number, Order number and item number, quantity in box, shipment date, and names and addresses of the Seller and the Buyer. An itemized packing list and/or Bill of Lading must accompany each shipment. Each packing slip shall include; this Order number, quantity, item description, order date, shipping date and delivery address, but shall not include pricing information. All shipments of hazardous materials under this Order shall comply with current U.S. Department of Transportation (DOT) regulations as published in 49 CFR 100-199, and the labeling shall meet the current U. S. Occupational Safety and Health Administration (OSHA) regulations as published in 29 CFR 1910.1200, for the transporting and labeling of hazardous materials. Material Safety Data Sheets (MSDS) shall be supplied with the first shipment of all hazardous materials, and these sheets shall be resubmitted if any changes or updates, as required, are made. A second copy must be sent to the Buyer

16.    **THE SELLER AS AN INDEPENDENT CONTRACTOR:** Seller shall perform the obligations of this Order as an independent contractor and under no circumstances shall it be considered an agent or employee of the Buyer. The Terms and Conditions of this Order shall not, in any way, be construed as to create a partnership or any other kind of joint undertaking or venture between the parties hereto. The Seller expressly waives any and all rights which may or may not exist to claim any relief under the Buyer's comprehensive insurance policy, worker's compensation or unemployment benefits.

17.    **STANDARDS OF CONDUCT:** The Seller must reassign its employees, agents and subcontractors working on the Buyer's premises if any such personnel are deemed to be disruptive, dangerous, incompetent, or otherwise noncompliant with reasonable conduct guidelines and Buyer's policies and procedures. At the Buyer's request, the Seller will distribute publications supplied by the Buyer regarding the Buyer's policies, practices, and procedures, including, but not limited to, Affirmative Action and Sexual Harassment policies.

18.    **INVOICING/PAYMENTS/SET-OFFS:** After each delivery pursuant to this Order, the Seller shall send invoices including item number(s) to the Buyer's address as indicated on the face of this Order. Seller shall bear the risk of non-payment by Client for any or all of its Work. The Buyer shall pay the Seller's invoices upon receipt of payment from Client or within forty five (45) days after receipt of a proper invoice or acceptance of delivered items or services rendered by the Seller, whichever occurs later, unless otherwise specified. The Buyer may make any adjustments in Seller's invoice due to shortages, late delivery, rejections, or other failure to comply with the requirements of this purchase order before payment. The Buyer shall have right at any time to set-off any amounts due to the Seller, (or any of its associated or affiliated companies) against any amounts owed by the Buyer with respect to this Order or any subsequent Order or any other contractual agreement between the parties hereto unless such set-off violates local law or regulations. Invoices older than 75 days after the delivery date will not be considered for payment.

19.    **INSURANCE AND STATUTORY OBLIGATIONS:** If any part of this Order involves the Seller's performance on the Buyer's premises or at any place where the Buyer conducts operations, or with material or equipment furnished to the Seller by the Buyer, the Seller shall take all necessary precautions to prevent injury to persons or property during the progress of such work. The Seller shall maintain public liability, personal injury, and property damage insurance and employer's liability and compensation insurance, in an amount determined by the Buyer to be appropriate, to protect the Buyer from said risks and from any statutory liabilities whatsoever arising there from. The Seller shall produce evidence of such insurance upon request by the Buyer.

20.    **COMPLIANCE WITH LAWS**
Statutory Compliance: Seller certifies that the goods ordered were produced in compliance with all applicable requirements of Sections 6, 7, and 12 of the Fair Labor Standards Act of 1938, as amended, and of regulations and orders of the Administrator of the Wage and Hour Division issued under Section 14 thereof. This Order is subject to, and incorporates by reference, the following terms and provisions published by the Office of Federal Contract Compliance Programs, Department of Labor: (1) Equal Opportunity Clause (41 CFR Part 60-1.4) under Executive Order 11246, as amended, and the regulations there under; (2) Affirmative Action Clause for Disabled Veterans of the Vietnam Era (41 CFR Part 60-250.5) under Section 402 of the Vietnam Era Veteran's Readjustment Assistance Act of



757 410.0233    600 Independence Parkway, Suite 105, Chesapeake, VA 23320    TMMG 01 1002

1974, as amended, and the regulations there under; (3) Affirmative Action Clause for Handicapped Workers (41 CFR 60-741.5) under Section 503 of the Rehabilitation Act of 1973, as amended, and the regulations there under. The Seller also agrees to comply with the Fair Labor Standards Act and the Occupational Safety and Health Act, and all other applicable federal, state, county, and local laws, ordinances, regulations and codes (including the procurement of required permits and certificates and compliance with the Small and Minority Business Investment Act known as Public Law 95-507) in the Seller's performance hereunder. The Buyer encourages the Seller to provide opportunities and assistance to small, small disadvantaged, veteran owned and woman owned businesses in accessing the necessary channels to allow their maximum participation in the provision of goods and services. The Seller further agrees to indemnify and hold the Buyer and its customers harmless from any loss or damage that may be sustained by the Buyer, by reason of the Seller's failure to comply with any federal, state, county or local laws, ordinance, regulations and codes.

Compliance with Environmental Laws:  Seller shall identify material containing a hazardous material or substance including, but not limited to, those governed by the Resources Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.) and any similar acts and regulations promulgated pursuant to these acts. Each component, self-contained unit and carrier and shipping container shall be marked identifying the hazardous material by name. NOTIFICATION OF HAZARDOUS PRODUCT shall be sent to the Buyer's Purchasing Agent and shall specify the product name and part number, the nature of the hazard, proper precautions that must be undertaken by the Buyer or others and any additional information that the Buyer should reasonably expect to know to protect its interest.

**21.    GOVERNMENT CONTRACT PROVISIONS:**  If the Goods purchased hereunder are for use on a prime contract or subcontract of Buyer with the United States Government, the prevailing Defense Acquisition Regulations and Federal Procurement Regulations existing at the date of this order, which the government makes mandatory for inclusion in all Subcontracts/Purchase Orders hereunder, shall apply.  When accepted, this order will constitute a subcontract under the prime contract awarded by the United States Government, and the requisite flowed-down clauses will be defined in the Order.

**22.    REPRODUCTION OF DOCUMENTATION:**  Unless otherwise marked as "Proprietary..." by Seller, Buyer shall have the right at no additional charge, to use or incorporate all or portions of material found in the Seller's literature and/or reproduce the Seller's applicable literature such as operating and maintenance manuals, technical publications, prints, drawings, training manuals and other similar supporting documentation and sales literature. The Seller agrees to advise the Buyer of any updated information relative to the foregoing.

**23.    CANCELLATION AND TERMINATION:**  (a) Termination-Convenience – The performance of work under this order may be terminated in whole or in part, by Buyer of Buyer's convenience in accordance with the "Termination" clause in FAR 52.249-2 (as modified in 49.502(e)). In paragraph (c) of FAR 52.249-2, change 120 days to 45 days; in (e), change one year to six months. (b) Termination-Default – This order may be terminated in whole or in part by Buyer for default in accordance with the "Default" clause in FAR 52.249-8 (incorporated by reference). Except that the word "government" in all paragraphs other than (c) means Buyer. "Contractor" means Seller, and the references to a disputes clause shall mean Clause 25, "Disputes". Remedies granted under this clause shall be in addition to any other remedies which may be available to Buyer. If the parties fail to agree on the amount to be paid for manufacturing materials referred to in paragraph (d) of the "Default" clause, the amount shall be their reasonable value (not to exceed a reasonably allocable portion to the price of this order). The Buyer may cancel this Order in whole or in part at any time for cause by written, notice to the Seller, effective when sent, in the event that the Seller: (a) fails to comply with any term or condition of this Order including, but not limited to, delivery terms and warranty; or (b) appoints a receiver, liquidator or trustee in bankruptcy or other similar officer over any or all of its property or assets; or (c) files a voluntary petition in bankruptcy; or (d) has had filed against it an involuntary petition in bankruptcy which remains in effect for thirty (30) days; or (e) voluntarily ceases trading; or (f) merges with or is acquired by a third party; or (g) assigns any of its rights or obligations under the Order to a third party without the Buyer's advance written consent. Upon the occasion of any one of the aforesaid and in addition to any remedies which the Buyer may have in Law or in Equity, the Buyer may also cancel this Order or any outstanding deliveries hereunder by notifying the Seller in writing of such cancellation and the Seller shall thereupon transfer title and deliver to the Buyer such work in progress or completed Goods as may be requested by the Buyer. The Buyer shall have no liability to the Seller beyond payment of any balance owing for Goods purchased hereunder and delivered to and accepted by the Buyer prior to the Seller's receipt of the notice of termination, and for work in progress requested for delivery to the Buyer.

**24.    AUDIT:**  If Buyer deems an audit of Seller's books and records is needed to review cost or pricing data, compliance with price warranties, to price changes, termination, or otherwise, an audit may be conducted by Buyer, an independent party, or a Government Audit Agency.

**25.    DISPUTES:**  Either party may litigate any disputes arising under or relating to this order before any court of competent jurisdiction or forum selected by Buyer.  Pending resolution of any such dispute by settlement or by final judgment, Seller shall proceed diligently with performance.



757 410.0233    600 Independence Parkway, Suite 105, Chesepeake, VA 23320    TMMG.US.COM

26.    **GOVERNING LAW AND VENUE:** The validity, performance, and construction of this order shall be governed by the laws of the Commonwealth of Virginia. The Buyer and Seller waive personal service of any summons and complaint or other process in any action brought in said courts, and agree that service thereof may be made by registered mail, return receipt requested, directed to the other at the location specified on the face hereof.

27.    **SEVERABILITY:** The provisions of this Agreement are separate and divisible, and if any court shall determine any provision of this Agreement is void and/or unenforceable, the remaining provision or provisions shall remain.

U.S. Department of Labor

Office of Administrative Law Judges
11870 Merchants Walk – Suite 204
Newport News, VA 23606

(757) 591-5140
(757) 591-5150 (FAX)

Issue Date: _____

CASE NO.:          2018-LDA-00591

OWCP No:    06-320344

In the Matter of:

KIMBERLY DUVALL,
Survivor of EDWARD J. DUVALL,
                         Claimant,

v.

MI-TECH, INCORPORATED,
                         Employer,

and

ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS
WC-MCU,

                    Carrier.

## ORDER TO SHOW CAUSE

On January _____, 2019, Claimant filed a motion to add The McHenry Management Group, Inc., [TMMG] as a party.  Claimant avers that the decedent, Edward Duvall, was engaged in the repair of a United States Navy ship, the USS Whitney, at a shipyard in Croatia, in furtherance of a contract between The McHenry Management Group, Inc. [TMMG] and the United States Department of Defense for work that meets the coverage requirements of Section 1(a) of the Defense Base Act.  TMMG subcontracted with the decedent's employer, Mi-Tech, for some of the work, via a purchase order.  Claimant further avers Claimant avers that Mi-Tech did not secure DBA coverage for its employees; therefore, TMMG and its insurer, who is unknown, may be liable for any death benefits that are awarded to her.

Exhibit 2

Having considered the foregoing, IT IS HEREBY ORDERED that TMMG show cause, if any there be, by _____, 2019, why it should not be joined in this matter as a necessary and indispensable party.

Ordered this _____ day of _____, 2019, at Newport News, Virginia.

_____
DANA ROSEN
ADMINISTRATIVE LAW JUDGE

2

## CERTIFICATE OF SERVICE

The undersigned certifies that the within and foregoing **Employee's Motion to Add a**

**Party** has this date been served upon the following by mailing a copy of same through the United

States mail, properly addressed, in an envelope bearing sufficient postage thereon, as follows:

> Allen D. Hemphill, Esq.
> Brown Sims
> 1177 West Loop South, Tenth Floor
> Houston, TX 77027-9007
>
> Mark K. Eckels, Esq.
> Boyd & Jenerette
> The Levy Building
> 201 North Hogan Street, Suite 400
> Jacksonville, FL 32202
>
> TMMG
> 600 Independence Parkway, Suite 105
> Chesapeake, VA 23320

This 2nd day of January, 2019.

Eric R. Gotwalt

ZIPPERER, LORBERBAUM & BEAUVAIS
P.O. Box 9147
Savannah, GA  31412
Ph. (912) 232-3770
Fx. (912) 232-0643
egotwalt@zlblaw.com

# **EXHIBIT 4**

UNITED STATES DEPARTMENT OF LABOR

OFFICE OF ADMINISTRATIVE LAW JUDGES

KIMBERLY DUVALL
Survivor of EDWARD J. DUVALL,                    CASE NO:    2018-LDA-00591
                        CLAIMANT

VERSUS                                           OWCP NO:  06-320344

MI-TECH, INCORPORATED,
                        EMPLOYER

AND

ZURICH AMERICAN INSURANCE COMPANY
OF ILLINOIS WC-MCU,
                        CARRIER

AND

STARR INDEMNITY & LIABILITY COMPANY
c/o GALLAGHER BASSETT SERVICES,
                        CARRIER

AND

DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS,
                PARTY-IN-INTEREST

### TMMG'S and CHUBB INSURANCE COMPANY'S
### MOTION TO CONTINUE FORMAL HEARING
### WITH INCORPORATED MEMORANDUM IN SUPPORT

**MAY IT PLEASE THE COURT:**

      The McHenry Management Group, Inc. ("TMMG") and Chubb Insurance Company,

submit this Motion to Continue Formal Hearing (with incorporated memorandum in support)

and respectfully urge this Honorable Court to continue the formal hearing currently set in

this matter on January 23, 2020 for the following reasons:

## I.    Post-December 20, 2019 Status Conference with the Court (Jurisdiction Issue)

On December 20, 2019, this Court conducted a telephonic status conference to address various issues, which took place immediately before the corporate deposition of defendant, TMMG. During the conference, various issues were raised, including insurance coverage, jurisdiction, outstanding discovery and potential exploration of settlement via Settlement Judge Conference.   Your Honor requested a status report following the deposition and undersigned counsel represents that the following issues supporting the requested continuance can partially (if not wholly) serve as a status report.

The TMMG corporate deposition confirmed that jurisdiction is still an issue.  DBA jurisdiction has not been established.  None of the parties herein had a contract that would give rise to DBA jurisdiction.  The shipyard who may have had a contract giving rise to DBA jurisdiction is not currently a party to this action and any contract it had with a government entity has not been confirmed to give rise to DBA jurisdiction.   Following the TMMG corporate deposition, it is likely in the parties' best interests and in the interests of judicial efficiency to explore joining the shipyard to the claim to explore this critical issue. DBA jurisdiction has not been established and further, a review of the allegations and initial established facts leads to the conclusion that DBA jurisdiction does not exist.  ( 42 USC § 1651 et seq.)

## II.    Insurance Coverage Issue

As noted in prior filings with this Court, there is also an insurance coverage issue as it pertains to TMMG.  While Claimant has joined Chubb Insurance Company as DBA insurer for TMMG, it was never established that Chubb provided DBA coverage to TMMG

for the work being performed by Employee in this matter.

The December 20th TMMG cooperate deposition confirmed that the Chubb policy (issued to TMMG) giving rise to the joinder of Chubb into this claim did not provide DBA coverage to the alleged accident. That policy covered wholly unrelated matters and clearly did not provide coverage to the work being performed by Employee that allegedly caused his death.

This presents a potential conflict for undersigned counsel as counsel was retained by Chubb to defend the parties until the coverage issue was resolved (under a reservation of rights). Now that there is confirmation of no coverage, TMMG may/will need to secure other counsel and may/will be prejudiced in doing so three weeks from formal hearing. This issue is further complicated by the timing of the confirmation being during the holidays where various companies' representatives are not

III.    **Outstanding Discovery Issues**

During the time the parties were discussing setting TMMG's corporate deposition, the defendants were also discussing setting and taking the Widow's deposition. The holidays made these tasks difficult, but the TMMG deposition was set since it addressed many important issues. However, the Widow's deposition has not been set to date and remains outstanding.

Additionally, on December 5, 2019, Claimant's counsel produced an expert causation report from Dr. Charles Schulman. Dr. Schulman will need to be deposed and his deposition is not set yet and remains outstanding.

-3-

## IV.    Parties' Positions to Continuance

Mi-Tech is not opposed and joins this continuance request.

Claimant is opposed to the continuance request.

## V.    Good Cause Exists

Under the Rules of Practice and Procedure for Administrative Hearings Before the

Administrative Law Judges §18.28, "Continuances will only by granted in cases of prior

judicial commitments or undue hardship, or a showing of other good cause." In the instant

matter, good cause exists, judicial efficiency will be served and undue prejudice/hardship

will be prevented by the granting of a continuance.

## VI.    Conclusion

For the reasons noted above, and good cause shown, TMMG and Chubb Insurance

Company respectfully request that the January 23, 2020 Formal Hearing be continued so

all outstanding issues can be resolved, that no party is unduly prejudiced to recently-

confirmed insurance coverage issues, and that settlement of the claim can be explored.

Respectfully submitted,

ALAN G. BRACKETT        (14094)
ROBERT N. POPICH        (29386)
MOULEDOUX, BLAND, LEGRAND & BRACKETT, LLC
701 Poydras Street, Suite 4250
New Orleans, LA    70139
Telephone:    504.595.3000
Facsimile:    504.522.2121
Attorneys for The McHenry Management Group
EAC008 Mtn2Cont.wpd

-4-

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that the above and foregoing pleading has been forwarded to

all counsel of record by email, facsimile or by depositing a copy of same, properly

addressed and First Class postage prepaid, in the United States Mail on this 31st day of

December, 2019.